# United States Court of Appeals for the Federal Circuit

04-1083

CATHEDRAL CANDLE COMPANY
and THE A.I. ROOT COMPANY,

Plaintiffs-Appellants,

v.

UNITED STATES INTERNATIONAL TRADE COMMISSION and
DEANNA TANNER OKUN, Chairman, United States International Trade Commission,

Defendants-Appellees,

and

BUREAU OF CUSTOMS AND BORDER PROTECTION and
ROBERT C. BONNER, Commissioner, Bureau of Customs and Border Protection,

Defendants-Appellees.

Steven M. Schneebaum, Patton Boggs LLP, of Washington, DC, argued for plaintiffs-appellants. With him on the brief was Michael J. Schaengold.

Michael Diehl, Attorney-Advisor, Office of the General Counsel, United States International Trade Commission, of Washington, DC, argued for defendants-appellees United States International Trade Commission, et al. On the brief were James M. Lyons, Acting General Counsel; Neal J. Reynolds, Acting Assistant General Counsel for Litigation; and Karen Veninga Driscoll, Attorney. Of counsel was Mark B. Rees, Attorney.

David Silverbrand, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendants-appellees Bureau of Customs and Border Protection, et al. On the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; Jeanne E. Davidson, Deputy Director; and Paul D. Kovac, Trial Attorney. Of counsel on the brief was Charles R. Steuart, Attorney, Office of Chief Counsel, United States Bureau of Customs and Border Protection, of Washington, DC.

Appealed from: United States Court of International Trade

Judge Donald C. Pogue

# United States Court of Appeals for the Federal Circuit

04-1083

CATHEDRAL CANDLE COMPANY,
and THE A.I. ROOT COMPANY,

Plaintiffs-Appellants,

v.

UNITED STATES INTERNATIONAL TRADE COMMISSION and
DEANNA TANNER OKUN, Chairman, United States International Trade Commission,

Defendants-Appellees,

and

BUREAU OF CUSTOMS AND BORDER PROTECTION and
ROBERT C. BONNER, Commissioner, Bureau of Customs and Border Protection,

Defendants-Appellees.

_____

DECIDED:  March 9, 2005

_____

Before LOURIE, BRYSON, and DYK, Circuit Judges.

Opinion for the court filed by Circuit Judge BRYSON.  Dissenting opinion filed by Circuit Judge DYK.

BRYSON, Circuit Judge.

Appellants Cathedral Candle Company ("Cathedral") and The A.I. Root Company ("Root") filed this action in the Court of International Trade seeking to compel the Bureau of Customs and Border Protection ("Customs") to distribute payments to them pursuant to the Continued Dumping and Subsidy Offset Act of 2000, Pub. L. No. 106-

387, § 1(a) [tit. X, § 1003(a)], 114 Stat. 1549, 1549A-72 (2000), which is known as the Byrd Amendment. Cathedral and Root applied for Byrd Amendment distributions from funds derived from antidumping duties collected on petroleum wax candles imported from the People's Republic of China in the years 2000 and 2001. Customs determined that Cathedral and Root were ineligible for those distributions because the two companies had not made timely requests for payment. The Court of International Trade sustained Customs' ruling. We affirm.

I

In 1985, the National Candle Association filed an antidumping petition alleging that the importation of petroleum wax candles from China was causing and threatening to cause material injury to the domestic candle industry. The Department of Commerce and the International Trade Commission initiated an investigation, in the course of which the Commission sent questionnaires to domestic producers of candles. Both Cathedral and Root received and responded to the questionnaires, and both indicated their support of the petition. The questionnaires were marked "Business Confidential" on the top of each page, and the "General Information and Instructions" portion of the questionnaires explained that the commercial and financial information furnished in response to the questionnaires would be treated as confidential. Following the investigation, Commerce issued an antidumping order covering Chinese candle imports. That antidumping order has remained in effect since that time.

The Byrd Amendment, enacted in late 2000, requires Customs annually to distribute funds collected pursuant to antidumping and countervailing duty orders to certified "affected domestic producers." 19 U.S.C. § 1675c. The statute defines an

affected domestic producer as a party that was a petitioner or supporter of an antidumping or countervailing duty petition and that continues to produce the product that was the subject of the resulting order. Id. § 1675c(b)(1). The statute assigns to the International Trade Commission the responsibility to compile a list that includes petitioners and "persons that indicate support of the petition by letter or through questionnaire response." Id. § 1675c(d)(1). The Commission is directed to forward that list to Customs, which in turn is required to publish in the Federal Register, at least 30 days before a distribution of funds, a notice of intention to distribute funds to the parties on the Commission's list. Id. The statute requires Customs next to request a certification from each potentially eligible affected domestic producer in which the producer represents that it desires to receive a distribution, that it is eligible for a distribution, and that it has qualifying expenditures for which it has not previously received a distribution. Id. § 1675c(d)(2). The funds, which come from assessed duties received in the preceding fiscal year, are distributed to affected domestic producers who satisfy particular statutory criteria. Id. § 1675c(d)(3); See generally Candle Corp. of Am. v. U.S. Int'l Trade Comm'n, 374 F.3d 1087, 1089-90 (Fed. Cir. 2004). The distribution of funds from duties assessed each fiscal year must be distributed not later than 60 days after the end of that fiscal year. 19 U.S.C. § 1675c(c).

On December 29, 2000, the Commission sent Customs a list that included the names of the petitioners and petition supporters for each pending antidumping and countervailing duty order that was in effect as of January 1, 1999, except for those orders that were subsequently revoked. Along with the list, the Commission sent a letter to Customs in which the Commission chairman stated that because section 777 of

the Tariff Act of 1930, 19 U.S.C. § 1677f, "prohibits the Commission from disclosing business proprietary information, with certain specifically enumerated exceptions not applicable here, the list only includes those persons referenced by section 754(d)(1) [19 U.S.C. § 1675c(d)(1)] that indicated public support for the petition." Thus, parties such as Cathedral and Root that had stated their support for a petition under a promise of confidentiality and had not waived confidentiality as to the information were not included on the Commission's list. Customs published the Commission's list and the accompanying letter from the Commission chairman on its website in early 2001.

In June 2001, Customs published a notice in the Federal Register of its proposed rules for distributing funds under the Byrd Amendment. 66 Fed. Reg. 33,920 (June 26, 2001). That publication contained a notification that Customs had received the initial list of affected domestic producers from the Commission; a statement that the resolution of any dispute regarding the list of affected domestic producers in any given case was the responsibility of the Commission, not Customs; a reference to the Customs website address where the Commission list could be found; and a statement that continued updates to the list would be processed as necessary. Id. at 33,920-21.

In August 2001, Customs published in the Federal Register a notice of proposed distribution of Byrd Amendment funds for 2001 along with an updated list of affected domestic producers. 66 Fed. Reg. 40,782 (Aug. 3, 2001). That publication put potential distribution recipients on notice that they must file their certifications of eligibility by a specific date in order to receive distributions for fiscal year 2001. A deadline of October 2, 2001, was set for filing certifications for the 2001 distributions. Neither Cathedral nor Root was on the August 2001 list, and neither filed a certification with Customs for a

distribution of Byrd Amendment funds for fiscal year 2001. Neither received a distribution for that year.

In July of 2002, Customs published in the Federal Register an announcement of its intention to distribute offsets for fiscal year 2002. 67 Fed. Reg. 44,722 (July 3, 2002). That publication included an updated list of affected domestic producers. The new list included seven domestic candle producers, but not Cathedral and Root. Customs announced that written certifications to obtain a distribution would have to be received by September 3, 2002.

After the September 2002 deadline passed, Cathedral and Root discovered from informal contacts within the candle industry that they might be eligible for Byrd Amendment distributions. They sent letters to the Commission waiving confidentiality with respect to their support of the antidumping petition and requesting that they be added to the Commission's list of affected domestic producers. When it received the letters, the Commission added Root and Cathedral to the list and forwarded the new information to Customs. Cathedral and Root then submitted certifications to Customs seeking Byrd Amendment distributions for 2002. Customs rejected their certifications as untimely because the September 3 deadline had already passed. Accordingly, Cathedral and Root received no Byrd Amendment distributions for fiscal year 2002. However, they were included on the list of affected domestic producers for 2003, and they received distributions for that year.

Cathedral and Root filed this action in the Court of International Trade, contending that the Commission and Customs had wrongfully deprived them of their right to Byrd Amendment distributions for 2001 and 2002. The plaintiffs moved for

judgment on the agency record. For reasons set forth in a detailed opinion, the trial court denied the plaintiffs' motion and entered judgment for the defendants.

The trial court held that Customs had properly dismissed the certifications as untimely. The court noted that Cathedral and Root had ample notice of the deadline for filing certifications of eligibility for distributions, giving them time to discover that they were not on the list of affected domestic producers and to seek an amendment to the list before the certifications were due. With regard to the appellants' argument that the Commission violated the requirements of the Byrd Amendment when it failed to include their names on the list of affected domestic producers that it forwarded to Customs, the court noted that the Commission was confronted with a statutory ambiguity arising from the interplay between the Byrd Amendment and section 777. On the one hand, the Byrd Amendment required the Commission to forward a list of all affected domestic producers, while on the other hand section 777 required the Commission to accord confidential treatment to proprietary business information submitted to the Commission in the course of antidumping and countervailing duty investigations. The court explained that the Commission interprets section 777 and its regulation on confidentiality, 19 C.F.R. § 201.6, to require it to keep confidential whether questionnaire respondents had expressed support for antidumping or countervailing duty petitions. Moreover, the court noted that the questionnaires sent to Cathedral and Root were labeled "Business Confidential," which put Cathedral and Root on notice that their responses would not be made publicly available. The court added that the Commission had stated in its explanatory letter, which was posted on the Customs website, that it regarded expressions of support for petitions that were made in such

questionnaires to be confidential until and unless the party waived its right to confidentiality.

The court ruled that even if the list of affected domestic producers was incomplete, Cathedral and Root were on constructive notice of the list's existence and could have petitioned to be added to the list at any time before the deadline for filing certifications. Their failure to meet the regulatory deadlines, the court held, cannot be excused because of the failure of the Commission and Customs to provide explicit notice in the Federal Register as to why certain names were excluded from the list of affected domestic producers. Cathedral and Root were on notice that there was such a list, that they might be eligible for inclusion on the list, and that there was a specific deadline for filing their certifications. Under those circumstances, the court held that Cathedral and Root were not legally entitled to receive Byrd Amendment distributions for 2001 and 2002.

II

Cathedral and Root argue that the Commission violated the requirements of the Byrd Amendment when it failed to include their names on the list of potential affected domestic producers for 2001 and 2002 and that the omission excused their failure to file certifications for distributions on a timely basis. In their view, the Byrd Amendment imposes an unqualified duty on the Commission to forward the names of all petition supporters to Customs for publication in the Federal Register. That duty, according to Cathedral and Root, is not in any way limited or qualified by the Commission's duty under section 777 not to disclose, without consent, proprietary information that a party has submitted to the Commission.

The Commission and Customs contend that the Commission properly omitted from the list of petition supporters those parties that had indicated their support for the antidumping petition in their responses to confidential questionnaires and had not waived their right to confidentiality. They argue that the disclosure requirement of the Byrd Amendment conflicts with the confidentiality requirement of section 777, as construed by the Commission and the Department of Commerce through published regulations and longstanding practice. The Commission argues that it acted reasonably in attempting to accommodate the two statutory directives by construing the Byrd Amendment not to require disclosure of information protected by section 777.

The Byrd Amendment requires that the Commission forward a list of petitioners and petition supporters to Customs. It does not address whether that requirement applies to information that has been provided under a promise of confidentiality. Section 777 requires that, except in limited circumstances, information submitted to the Commission or the Commerce Department that is "designated as proprietary by the person submitting the information" shall not be disclosed without the consent of the person submitting the information. 19 U.S.C. § 1677f(b)(1)(A).

On its face, the confidentiality obligation imposed on the Commission by section 777 appears to create a potential conflict with the broad disclosure requirement of the Byrd Amendment. That potential conflict has been sharpened by agency action: Both the Commission and the Department of Commerce have interpreted section 777 to apply to information provided by questionnaire respondents, including whether or not they support a particular antidumping or countervailing duty petition. Based on its interpretation of section 777, the Commission resolved the conflict between the two

statutes by concluding that it could not include in the list of petition supporters that it forwarded to Customs those companies that had provided information regarding petition support under a promise of confidentiality. Because the Commission had promised Cathedral and Root that their questionnaire responses, including their support for the petition in the petroleum wax candle case, would be treated as "business confidential" information, the Commission determined that section 777 barred it from including Cathedral and Root in the list of petition supporters that it sent to Customs.

A

The Commission contends that its construction of the Byrd Amendment in light of section 777 is entitled to deference under the standard set forth in the Supreme Court's decision in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Under that standard, a court must defer to an agency's construction of a statute governing agency conduct if the court finds that the statute in question is ambiguous and the agency's interpretation is reasonable.

The Supreme Court has stated that the Chevron standard of deference applies if Congress either leaves a gap in the construction of the statute that the administrative agency is explicitly authorized to fill, or implicitly delegates legislative authority, as evidenced by "the agency's generally conferred authority and other statutory circumstances." United States v. Mead Corp., 533 U.S. 218, 229 (2001). Normally, courts accord Chevron deference when Congress has authorized the administrative agency "to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed." Id. ("It is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides

for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force."); see also Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs, 260 F.3d 1365, 1378 (Fed. Cir. 2001) ("Chevron deference normally does not apply to informal proceedings.").

To be sure, the Supreme Court has explained that Chevron deference to an agency's legal determination may be appropriate in some instances even if the agency has not reached its legal conclusion through notice and comment rulemaking or formal adjudication. See Barnhart v. Walton, 535 U.S. 212, 221-22 (2002); Mead, 533 U.S. at 230-31. In such instances, however, the Court has looked for indications that Congress meant to delegate to the agency the authority to make determinations having the force of law.

In Barnhart, for example, the Court noted that the administrative interpretation at issue was one of longstanding duration, that Congress had frequently amended the statute in question without questioning the administrative construction, and that the statute was of sufficient complexity that it was fair to assume that Congress understood that the agency would be required to engage in policymaking when it administered the statute. See 535 U.S. at 220-22. The Court concluded that "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, and the careful consideration the Agency has given the question over a long period of time" indicated that "Chevron provides the appropriate legal lens through which to view the legality of the Agency interpretation here at issue." Id. at 222.

B

The deference question in this case is complicated because it involves multiple statutory provisions, multiple agencies with responsibility for administering the statutory scheme, multiple pertinent regulations, and multiple forms of informal agency action that bear on the questions before us. Thus, the Commission, Customs, and the Commerce Department all have roles to play either under the antidumping and countervailing duty statutes or under the Byrd Amendment or both; the Commission and Commerce both have formal regulations that bear on the proper interpretation of section 777; and in addition to the formal regulations, the Commission points to various informal indications of agency policy regarding the interpretation of the statutes at issue, including the letter from its chairman that was sent to Customs and posted on Customs' website. Finally, the case requires us to address two separate but related deference issues: the proper construction of section 777; and the proper interpretation of the Byrd Amendment in light of section 777, as properly construed.

1

As a first step, we must decide whether the Commission properly construed section 777 to apply to information regarding the appellants' support for the petition. We begin by noting that section 777 is ambiguous with regard to its application to expressions of petition support provided under a pledge of confidentiality. Because the language of section 777 and the traditional tools of statutory construction do not make it clear whether the statute covers such information, the case cannot be resolved on the basis of what is referred to as "step one" of <u>Chevron</u>, which requires the court to decide questions of statutory construction "if Congress has directly spoken to the precise

question at issue." <u>Chevron</u>, 467 U.S. at 842-43 & n.9; <u>Candle Corp. v. U.S. Int'l Trade Comm'n</u>, 374 F.3d 1087, 1093 (Fed. Cir. 2004). We therefore turn to "step two" of the <u>Chevron</u> analysis, which requires the court to defer to the agency's interpretation if "the agency's answer is based on a permissible construction of the statute." <u>Chevron</u>, 467 U.S. at 843; <u>N.Y. Life Ins. Co. v. United States</u>, 190 F.3d 1372, 1380 (Fed. Cir. 1999).

In arguing that section 777 applies to confidential information regarding petition support, the Commission relies heavily on its regulation regarding business confidential information, 19 C.F.R. § 201.6. The Commission promulgated that regulation following formal notice and comment procedures and pursuant to congressional authorization to adopt rules and regulations necessary to carry out its functions and duties, 19 U.S.C. § 1335. The regulation is therefore entitled to full <u>Chevron</u> deference from this court. <u>See</u> <u>Pesquera Mares Australes Ltda. v. United States</u>, 266 F.3d 1372, 1379 (Fed. Cir. 2001) (according <u>Chevron</u> deference to notice-and-comment regulations relating to antidumping law issued pursuant to statutory rulemaking authorization by the Department of Commerce, the Commission's coordinate agency in administering the antidumping laws). This court has long held that <u>Chevron</u> deference applies to formal statutory interpretations by the Commission with respect to those aspects of the antidumping and countervailing duty laws administered by the Commission, and that <u>Chevron</u> deference is not limited to interpretations of those statutes by the Department of Commerce. <u>See</u> <u>Comm. for Fairly Traded Venezuelan Cement v. United States</u>, 372 F.3d 1284, 1289 (Fed. Cir. 2004); <u>Tex. Crushed Stone Co. v. United States</u>, 35 F.3d 1535, 1540 (Fed. Cir. 1994); <u>Suramerica de Aleaciones Laminadas, C.A. v. United States</u>, 966 F.2d 660, 665 n.5 (Fed. Cir. 1992).

Granting <u>Chevron</u> deference to the Commission's regulation, however, does not answer the question whether the Commission's interpretation of section 777 as applying to information regarding petition support is entitled to deference. That is because the Commission's regulation, on its face, does not refer to information regarding a questionnaire respondent's support for a petition. Instead, the regulation contains a more general definition of confidential information, which includes "information of commercial value, the disclosure of which is likely to have the effect of either impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions, or causing substantial harm to the competitive position of the person, firm, partnership, corporation, or other organization from which the information was obtained, unless the Commission is required by law to disclose such information." 19 C.F.R. § 201.6.

The gap between the text of the regulation and the Commission's interpretation of section 777 is filled by the Commission's interpretation of the regulation. The Commission states in its brief that it interprets the regulation to include information regarding a questionnaire respondent's support for a petition. It bases that interpretation on its contention that such information can be highly sensitive and that the disclosure of such information can result in competitive injury to the party from which the information was obtained. Although the Commission points to some prior Commission statements and precedents to support that interpretation, the specific interpretation of the regulation as applying to information regarding support for a petition is found only in

the Commission's brief. Nonetheless, Supreme Court precedents indicate that such an interpretation is sufficient to warrant deference.

To begin with, it is well settled that an agency's interpretation of its own regulations is entitled to broad deference from the courts. See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994); Martin v. Occupational Safety & Health Rev. Comm'n, 499 U.S. 144, 151 (1991); Udall v. Tallman, 380 U.S. 1, 16-17 (1965). Deference to an agency's interpretation of its own regulations is broader than deference to the agency's construction of a statute, because in the latter case the agency is addressing Congress's intentions, while in the former it is addressing its own. See Am. Express Co. v. United States, 262 F.3d 1376, 1382-83 (Fed. Cir. 2001). Thus, as the Supreme Court has explained, the agency's construction of its own regulations is "of controlling weight unless it is plainly erroneous or inconsistent with the regulation." Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945); see also James v. Office of Pers. Mgmt., 372 F.3d 1365, 1369 (Fed. Cir. 2004); Torrington Co. v. United States, 156 F.3d 1361, 1363-64 (Fed. Cir. 1998). That generous degree of deference is due to an agency interpretation of its own regulations even when that interpretation is offered in the very litigation in which the argument in favor of deference is made. See Auer v. Robbins, 519 U.S. 452, 461-62 (1997); Am. Express Co., 262 F.3d at 1382; Zurich Am. Ins. Co. v. Whittier Props. Inc., 356 F.3d 1132, 1137 & n.27 (9th Cir. 2004); Drake v. Fed. Aviation Admin., 291 F.3d 59, 68 (D.C. Cir. 2002). In this case, although the Commission had not previously advanced the precise interpretation of its regulation that it advances in its brief, there is "no reason to suspect that the interpretation does

not reflect the agency's fair and considered judgment on the matter in question," <u>Auer</u>, 519 U.S. at 462, and it is therefore entitled to deference.

Applying that standard, we uphold the Commission's interpretation of its regulation as covering information regarding a questionnaire respondent's support for a petition. While that interpretation is by no means compelled by the language of the regulation, it is not contrary to the express terms of the regulation, nor is it at odds with the purposes served by the regulation. Moreover, adding significant force to the reasonableness of the Commission's interpretation of section 777 is the plain language of 19 C.F.R. § 351.105(c)(10), a regulation of the Department of Commerce, the other agency that Congress has assigned, along with the Commission, to administer the antidumping and countervailing duty laws. That regulation specifically defines business proprietary information to include "the position of a domestic producer . . . regarding a petition." Although the Commerce regulation was not promulgated by the Commission, and although Congress has created a clear division of labor between the Commission and Commerce under the antidumping and countervailing duty laws, <u>see</u> <u>Hosiden Corp. v. Advanced Display Mfrs. of Am.</u>, 85 F.3d 1561, 1568 (Fed. Cir. 1996), the two agencies must necessarily work cooperatively in administering those statutes to the extent possible, and there is therefore nothing surprising or improper about the Commission adopting the same interpretation of section 777 as is found in Commerce's regulation. The Commerce regulation directly answers the question whether information regarding support of a petition is confidential information within the meaning of section 777. In light of the plain terms of the Commerce Department's regulation and the Commission's similar interpretation of its own regulation, we conclude that the

Commission's interpretation of section 777 as applying to information regarding a domestic producer's support for a petition is reasonable and is therefore binding on us.

3

The next step in the analysis is to determine whether, in light of the Commission's interpretation of section 777, to which we defer, the Commission properly concluded that the Byrd Amendment did not require it to disclose Cathedral and Root's support for the petroleum wax candle antidumping petition, as to which they had been promised confidentiality. To read the Byrd Amendment as conflicting with section 777 would require us to conclude that the Byrd Amendment implicitly repealed section 777 insofar as it applies to the disclosure of confidential information regarding petition support. The Supreme Court has frequently explained that repeals by implication are not favored, and it has instructed that "where two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1018 (1984); see also Watt v. Alaska, 451 U.S. 259, 267 (1981) (evidence of intention to repeal earlier statute must be "clear and manifest"; courts must read seemingly conflicting statutes "to give effect to each if we can do so while preserving their sense and purpose"); United States v. Borden Co., 308 U.S. 188, 198 (1939) ("When there are two acts upon the same subject, the rule is to give effect to both if possible."). The Commission so construed the Byrd Amendment in this case, and we uphold the Commission's construction.

To be sure, we do not believe that the Commission's interpretation of the Byrd Amendment is entitled to Chevron deference, for several reasons. First, the

Commission did not adopt its interpretation of the Byrd Amendment through the issuance of a regulation or through other formal process of the sort normally required to invoke Chevron deference. Congress did not authorize the Commission to construe the Byrd Amendment either through regulation or adjudication, and the Commission has not done so. Instead, the Commission's interpretation is embodied in its practice, as recited in the chairman's letter sent to Customs along with the initial Byrd Amendment list of petitioners and supporters. Second, the Commission's construction of the Byrd Amendment is only as old as the Byrd Amendment itself, and thus dates only to late 2000. Although consistently adhered to since that time, the Commission's position is not a "longstanding" agency interpretation of the sort presented in Barnhart. Finally, there is no indication that Congress foresaw that the Commission would need to make policy determinations in the course of applying the Byrd Amendment. Accordingly, we conclude that the Commission's interpretation of the Byrd Amendment in light of section 777 is not entitled to full Chevron deference.

Even if Chevron deference does not apply, an agency's construction of a statute that it is charged with administering is still subject to some deference under the standard set forth by the Supreme Court in Skidmore v. Swift & Co., 323 U.S. 134 (1944). While the Skidmore standard does not entail the same degree of deference to administrative decisionmaking as the Chevron standard, it nonetheless requires courts to give some deference to informal agency interpretations of ambiguous statutory dictates, with the degree of deference depending on the circumstances. Thus, the Court in Mead explained that "the fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked

to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." 533 U.S. at 228. The approach employed "has produced a spectrum of judicial responses, from great respect at one end . . . to near indifference at the other." Id. The Court went on to explain that an agency's interpretation of a statutory provision "may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency . . . and the value of uniformity in its administrative and judicial understanding of what a national law requires." Id. at 234, quoting Skidmore, 323 U.S. at 139. The degree of deference accorded to an agency's informal written interpretation of a statute, the Court added, may also depend on "the writer's thoroughness, logic, and expertise, its fit with prior interpretations, and any other source of weight." id. at 235.

In other cases, the Court has described the range of deference encompassed within the Skidmore standard in varying ways. It has noted that "reasonable agency interpretations carry "at least some added persuasive force," Metro. Stevedore Co. v. Rambo, 521 U.S. 121, 136 (1997), that "some deference" must be accorded to an agency's interpretive rule even if the rule is not entitled to full Chevron deference, Reno v. Koray, 515 U.S. 50, 61 (1995), that "some weight" is due to informal agency interpretations of statutory provisions, though not the "same deference as norms that derive from the exercise of . . . delegated lawmaking powers," Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 157 (1991), and that such interpretations are "entitled to respect," Christensen v. Harris County, 529 U.S. 576, 587 (2000); Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler, 537 U.S. 371, 385 (2003).

Beyond these general statements, the Court has not made clear the precise degree of deference owed to such informal agency interpretations of statutes, a task that may be impossible in light of the wide range of administrative actions that are subject to analysis under the Skidmore standard. At times, the Court has characterized the degree of deference to particular agency interpretations of statutes as depending on "the extent that the interpretations have the 'power to persuade.'" Christensen, 529 U.S. at 587. We are confident that the Court did not mean for that standard to reduce to the proposition that "we defer if we agree." If that were the guiding principle, Skidmore deference would entail no deference at all. Instead, we believe the Supreme Court intends for us to defer to an agency interpretation of the statute that it administers if the agency has conducted a careful analysis of the statutory issue, if the agency's position has been consistent and reflects agency-wide policy, and if the agency's position constitutes a reasonable conclusion as to the proper construction of the statute, even if we might not have adopted that construction without the benefit of the agency's analysis.

The agency action at issue in this case has many of the characteristics that the Supreme Court has identified as favoring deference to the agency's interpretation of the statute at issue. First, the Commission's interpretation of the Byrd Amendment represents an agency-wide position; it is not an interpretation that was made at a low level within the agency and that does not necessarily represent the views of the agency as a whole. See Mead, 533 U.S. at 233-34. Second, as reflected by the Commission chairman's letter, the Commission's interpretation was contemporaneous with the enactment of the Byrd Amendment and has been adhered to consistently by the agency

since that time. It is not a position formulated belatedly in response to litigation in this case or others, nor is it inconsistent with positions the Commission has previously taken. See Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 212-13 (1988). Third, the Commission has explained its reason for adopting the policy. Although the explanation in the Commission chairman's letter to Customs was brief, it made clear the statutory basis for the Commission's position. Fourth, the Commission's interpretation is consistent with the Commission's position regarding the commercial sensitivity of information such as petition support and with its longstanding practice of not revealing the identity of petition supporters. See Magnesium from Canada, USITC Pub. 2696, at 18 (Nov. 1993) (noting that industry members may be "reluctant to express support for relief because of possible negative reactions by customers that benefit from dumped or subsidized imports . . . [or because of possible] common projects or ties with respondents in other industries"). Finally, the Commission, together with the Department of Commerce, is responsible for administering the antidumping and countervailing duty statutes, and the Commission is directly responsible both for preparing the list of parties eligible for Byrd Amendment distributions and for protecting proprietary information submitted by private parties in the course of antidumping and countervailing duty investigations. Thus, the interpretation is the product of the Commission's "specialized expertise" in administering the antidumping laws, it is informed by the "investigations and information available to the agency," and it reflects a single uniform interpretation on the part of the agency. Mead, 533 U.S. at 234; Nat'l Org. of Veterans' Advocates, Inc., 260 F.3d at 1379. Under these circumstances, we consider the Commission's interpretation of statutory construction to be entitled to

considerable weight. Because that interpretation reflects a reasonable effort to resolve the potential conflict between section 777 and the Byrd Amendment, we accord it deference. Thus, based in part on our duty to accommodate seemingly conflicting statutory directives if possible, and based in part on the agency's reasoned effort to effect such an accommodation, we reject the appellants' contention that the Commission's interpretation is contrary to the plain language of the Byrd Amendment, and that the Byrd Amendment must be interpreted to trump the confidentiality provisions of section 777. Accordingly, we hold that the Commission did not violate the Byrd Amendment when it failed to include Cathedral and Root on the list of affected domestic producers that it forwarded to Customs in December 2000.

C

Contrary to the dissent, we do not believe the Supreme Court's decision in <u>FCC v. Nextwave Personal Communications, Inc.</u>, 537 U.S. 293 (2003), directly conflicts with our analysis, or is even especially relevant. The issue in the <u>Nextwave</u> case was whether a provision of the Bankruptcy Act barring any governmental agency from revoking a license to a debtor in bankruptcy because the debtor "has not paid a debt that is dischargeable" prevented the FCC from canceling Nextwave's licenses due to the company's failure to make installment payments for the licenses. The FCC argued that the statute prohibited only discriminatory cancellations directed at debtors in bankruptcy and did not bar the agency from declaring licenses void for nonpayment. The Court disagreed, finding the plain language of the Bankruptcy Act dispositive.

The <u>Nextwave</u> case involved the construction of a single statute; it did not present a situation, as does this case, in which two statutes are in tension and the court

is called on to resolve the tension between them. The Court readily disposed of the government's argument in Nextwave that the Bankruptcy Act conflicted with the Communications Act, by noting that nothing in the latter statute required that cancellation be the sanction for failure to make agreed-upon periodic payments for FCC licenses. 537 U.S. at 304. The Court concluded that what the FCC described as a conflict "boils down to nothing more than a policy preference on the FCC's part." Id.

This case, by contrast, presents a conflict between two statutory provisions, not a conflict between a statute and an agency's policy preference. This case would be similar to Nextwave if the Commission had decided as a policy matter to refrain from disclosing the identity of parties who expressed support for a petition. The Commission's position, however, was not the product of a policy preference, but was the result of a statutory directive as the Commission interpreted it. In that setting, it is our task to construe the two statutes in a way that best resolves any possible conflict between them, which is what we have sought to do. See Morton v. Mancari, 417 U.S. 535, 551 (1974) ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").

More pertinent than Nextwave is the Supreme Court's decision in Traynor v. Turnage, 485 U.S. 535 (1988). In that case, the Court addressed an apparent conflict between section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and a veterans' benefit provision denying certain benefits to veterans whose disability resulted from "the veteran's own willful misconduct," 38 U.S.C. § 1662(a)(1) (1988). Relying in part on the

Veterans Administration's regulatory interpretation of "willful misconduct" to include alcoholism, the Court resolved the conflict by construing the veterans' benefit statute, as interpreted by the Veterans Administration, to qualify the reach of the Rehabilitation Act. Following a similar path here, we construe section 777 of the Tariff Act, as interpreted by the Commission, to qualify the scope of the publication requirement of the Byrd Amendment.[1]

III

Cathedral and Root next argue that the Commission's policy of withholding the identity of petition supporters was not adopted in accordance with section 4 of the Administrative Procedure Act, 5 U.S.C. § 553, which requires agencies to publish certain rules and policy decisions in the Federal Register for notice and comment. As an initial matter, however, the procedures of section 4 do not apply to matters "relating to . . . benefits," 5 U.S.C. § 553(a)(2), which would appear to include Byrd Amendment distributions. Moreover, the section 4 procedures for rulemaking do not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure or practice." 5 U.S.C. § 553(b)(3)(A). As an informal interpretation of the requirements of the Byrd Amendment in light of section 777, the Commission's position did not constitute a substantive rule having the force and effect of law and therefore was

---

[1] Other courts of appeals have employed a similar approach in resolving apparent conflicts between statutes. See, e.g., Beckert v. Our Lady of Angels Apartments, Inc., 192 F.3d 601, 605-07 (6th Cir. 1999) (resolving conflict between two statutes based in part on administrative interpretation of one of the two); Mowbray v. Kozlowski, 914 F.2d 593, 599-601 (4th Cir. 1990) (resolving apparent conflict between two statutes based in part on agency interpretation that "harmonizes" the two); Rembold v. Pac. First Sav. Bank, 798 F.3d 1307, 1310-11 (9th Cir. 1986) (relying in part on administrative interpretation to conclude that two statutes are not incompatible).

not subject to the notice and comment requirements of section 553 of the APA.  See Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 99 (1995); Chrysler Corp. v. Brown, 441 U.S. 281, 301-02 & n.31 (1979).  Instead, the Commission's position that a party must waive its right to confidentiality of a questionnaire response prior to being placed on the list was merely a statement of what the Commission regarded as the legal requirement of section 777 and thus fell comfortably within the section 553(b)(3)(A) exception for interpretive statements.  See Paralyzed Veterans of Am. v. Sec'y of Veterans Affairs, 308 F.3d 1262, 1264 (Fed. Cir. 2002); Splane v. West, 216 F.3d 1058 (Fed. Cir. 2000); Paralyzed Veterans of Am. v. West, 138 F.3d 1434, 1436 (Fed. Cir. 1998), quoting Orengo Caraballo v. Reich, 11 F.3d 186, 195 (D.C. Cir. 1993).  For these reasons, it is exempt from the notice and comment requirements of section 4.

A more difficult question is presented by the appellants' alternative argument that the Commission failed to comply with the requirement of section 3 of the Administrative Procedure Act, as amended by the Freedom of Information Act, that each agency publish in the Federal Register "statements of general policy or interpretations of general applicability formulated and adopted by the agency."  5 U.S.C. § 552(a)(1)(D). See generally Morton v. Ruiz, 415 U.S. 199, 232-36 (1974).  The statute makes clear that section 552(a)(1)(D) does not require the publication of all statements of policy and interpretation, because another provision of the same statute, section 552(a)(2)(B), states that each agency shall "make available for public inspection and copying . . . those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register."  5 U.S.C. § 552(a)(2)(B) (emphasis added).

The line between matters falling within section 552(a)(1)(D) and matters falling within section 552(a)(2)(B) is notoriously difficult to draw. See Nat'l Leased Hous. Ass'n v. United States, 105 F.3d 1423, 1433 n.13 (Fed. Cir. 1997); N.Y. v. Lyng, 829 F.2d 346, 354 (2d Cir. 1987). Professor Davis commented that the distinction between "statements of general policy or interpretations of general applicability" that are required to be published in the Federal Register and other "statements of policy and interpretations" that are not, is incapable of being drawn "except in vague terms." Kenneth Culp Davis, Administrative Law Treatise § 5.11, at 341 (2d ed. 1978). Recognizing the difficulty of drawing that statutory distinction, the trial court found it unnecessary to decide whether the chairman's letter should have been published in the Federal Register. Although the court stated that "it seems probable that 5 U.S.C. § 552 would not require publication of the interpretation," the court ruled that in any event the non-publication of the chairman's letter did not entitle the appellants to any relief because it did not prejudice them. The trial court explained that the appellants had constructive notice of the existence of the list of affected domestic producers, they were advised through the Federal Register that they could raise questions regarding the list by inquiry to the Commission, and they were directed to the Customs website where the chairman's letter could be found. According to the trial court, it "was not necessary for Plaintiffs to know why they had been left off the list in order to make inquiries."

On appeal, the Commission argues, inter alia, that it was not required to publish the Commission chairman's letter because it was simply an application of the "clear requirements" of section 777. We do not share the Commission's view that its interpretation of section 777, as applied to the publication requirements of the Byrd

Amendment, is "simply the direct application of an unambiguous statute." Nonetheless, although we have found the statutory provisions less than "clear," we have construed section 777, in light of the Commission's interpretation, to bar the Commission from including those companies that had not waived their right to confidentiality on the Byrd Amendment list of affected domestic producers.

An agency interpretation that merely restates the requirements of a statute, on its face or as construed, need not be published, since it is the statutory directive, not the agency's interpretation, that governs in such cases. See, e.g., Kaspar Wire Works, Inc. v. Sec'y of Labor, 268 F.3d 1123, 1132 (D.C. Cir. 2001); Dilley v. Nat'l Transp. Safety Bd., 49 F.3d 667, 669-70 (10th Cir. 1995); Rochna v. Nat'l Transp. Safety Bd., 929 F.2d 13, 15-16 (1st Cir. 1991); United States v. Bowers, 920 F.2d 220, 222 (4th Cir. 1990); Tearney v. Nat'l Transp. Safety Bd., 868 F.2d 1451, 1454 (5th Cir. 1989); Knutzen v. Eben Ezer Lutheran Hous. Ctr., 815 F.2d 1343, 1351 (10th Cir. 1987). Since we have construed section 777 and the Byrd Amendment in accordance with the Commission's interpretation of those statutes, the Commission's failure to publish its interpretation of section 777 does not bar the enforcement of the statute as we have construed it.

To be sure, when an agency's interpretation of a statute plays a role in a court's construction of the statute, as it does here, it may appear to be a distinction without a difference to say that we are not applying the unpublished interpretation, but are applying a statute that we have construed with the aid of that same unpublished interpretation. Yet that analytical approach necessarily follows from the proposition that we give Skidmore deference to unpublished agency interpretations of statutes. If we were to interpret 5 U.S.C. § 552(a)(1)(D) to mean that an agency's unpublished

interpretation of a statute cannot be used in our construction of that statute, we would be engrafting a Federal Register publication requirement on the <u>Skidmore</u> doctrine, which would be inconsistent with the Supreme Court's decisions applying <u>Skidmore</u>. <u>See</u> <u>Mead</u>, 533 U.S. at 223, 234-35 (Customs ruling letters are not required to be published, but may be entitled to <u>Skidmore</u> deference); <u>Koray</u>, 515 U.S. at 61 (according deference to an unpublished agency guideline); <u>Christensen</u>, 529 U.S. at 586-87 (unpublished opinion letter entitled to consideration under <u>Skidmore</u>). Furthermore, in light of the provision in 5 U.S.C. § 552(a)(1) that makes even unpublished general interpretations effective against persons with "actual and timely notice of the terms thereof," making <u>Skidmore</u> deference subject to the publication requirement of section 552(a)(1)(D) could result in a statute having one interpretation for persons having notice of the agency interpretation and a different interpretation for persons not having such notice, which would obviously be a wholly unworkable outcome.

The Sixth Circuit has suggested, at least in the context of <u>Chevron</u> deference, that an agency interpretation of a statute that does not satisfy the publication requirement of 5 U.S.C. § 552(a)(1)(D) is not entitled to judicial deference. <u>D&W Food Ctrs., Inc. v. Block</u>, 786 F.2d 751, 757-58 (6th Cir. 1986). That decision, however, is contrary to the Tenth Circuit's analysis in <u>Knutzen v. Eben Ezer Lutheran Hous. Ctr.</u>, 815 F.2d 1343, 1351 (10th Cir. 1987), and the approach employed by the Supreme Court in <u>Morton v. Ruiz</u>, 415 U.S. 199 (1974), in the context of <u>Skidmore</u> deference.

In <u>Knutzen</u>, the court gave "some weight" to certain unpublished agency memorandums in the course of construing the statute in dispute. The court then noted

that the appellants objected to the agency's reliance on the memorandums on the ground that they were not published in accordance with 5 U.S.C. § 552(a)(1)(D). The court answered that objection by stating that in light of its analysis of the statute, the pertinent regulations, and the memorandums in question, the memorandums merely applied the governing statutory and regulatory rule and that they were therefore not required to be published. Knutzen, 815 F.2d at 1350-51.

The Supreme Court's decision in Morton v. Ruiz, although not explicit on the point, is consistent with this approach. The Court determined in that case that the Bureau of Indian Affairs ("BIA") had violated 5 U.S.C. § 552(a)(1)(D) when it failed to publish a statement of its policy regarding the eligibility of certain Indian tribal members for health services. As a consequence, the Court held that the BIA could not rely on that policy as a basis for "a legislative-type rule," rendering certain otherwise eligible Indians ineligible for the statutory benefits. 415 U.S. at 235-36. After having reached that conclusion, however, the Court went on to address the argument that "[e]ven assuming the lack of binding effect of the BIA policy," the policy was entitled to Skidmore deference in construing the eligibility provision of the underlying statute. Id. at 236. The Court did not reject that argument on the ground that the memorandums, not having been published in the Federal Register, were not entitled to be given weight under Skidmore; instead, the Court held that the memorandums did not represent a consistent agency position with respect to the meaning of the statute in question, and that, in any event, it was "evident" that Congress did not intend to limit eligibility in the manner described in the BIA memorandums. Id. at 236-38. Thus, the Court did not

treat the question of <u>Skidmore</u> deference as foreclosed by the agency's failure to comply with the publication requirement of section 552(a)(1)(D).

Employing a similar approach, we treat the availability of <u>Skidmore</u> deference as not dependent on agency compliance with the publication requirement of section 552(a)(1)(D). As such, we conclude that section 777, as we have construed it in light of the Commission's consistent administrative interpretation, bars the inclusion of non-public petition supporters on the Commission's list of affected domestic producers. For that reason we hold that the Commission was not required to publish the chairman's letter in the Federal Register pursuant to section 552(a)(1)(D). Accordingly, we conclude that the conduct of the Commission and Customs in creating and publishing the Byrd Amendment list of affected domestic producers for 2001 and 2002 did not excuse the failure of Cathedral and Root to file timely certifications for those years. The appellants are therefore not entitled to retroactive consideration for those two Byrd Amendment distributions.

<u>AFFIRMED</u>.

# United States Court of Appeals for the Federal Circuit

04-1083

CATHEDRAL CANDLE COMPANY,
and THE A.I. ROOT COMPANY,

Plaintiffs-Appellants,

v.

UNITED STATES INTERNATIONAL TRADE COMMISSION and,
DEANNA TANNER OKUN, Chairman, United States International Trade Commission,

Defendants-Appellees,

and

BUREAU OF CUSTOMS AND BORDER PROTECTION and
ROBERT C. BONNER, Commissioner, Bureau of Customs and Border Protection,

Defendants-Appellees.

DYK, Circuit Judge, dissenting.

Despite the majority's extensive and sophisticated analysis, I respectfully suggest that it has reached the wrong result in holding that the claims are time barred. In my view, the majority's approach to statutory construction directly conflicts with the approach required by the Supreme Court's decision in F.C.C. v. Nextwave Personal Communications, Inc., 537 U.S. 293 (2003).

The Byrd Amendment itself establishes no time limit for the filing of claims. 19 U.S.C. § 1675c(d) (2000). A Customs Regulation establishes a 60-day time limit, providing that "each affected domestic producer must submit a certification . . . that must be received within 60 days after the date of publication of the notice in the Federal Register. 19 C.F.R. §§ 159.62-63 (2004). Here the claimants did not file within the 60-

day period. Like the majority, I think that this 60-day time limit is generally valid. However, where, as here, Customs has failed to provide the statutorily required notice of eligibility to affected domestic producers, I think the time limit cannot be enforced.

The plain language of the Byrd Amendment requires notice to affected domestic producers of their eligibility, specifying that Customs must publish "a notice of intention to distribute the offset and <u>the list of affected domestic producers potentially eligible for the distribution</u> based on the list obtained from the Commission." 19 U.S.C. § 1675c(d)(2) (emphasis added). In those cases where "the Commission's records do not permit an identification of those in support of a petition," the statute imposes an affirmative duty on the International Trade Commission ("ITC") to "consult with the administering authority to determine the identity of the petitioner," when compiling the list of affected domestic producers. 19 U.S.C. § 1675c(d)(1). Customs is also required to "request a certification from each potentially eligible affected domestic producer." 19 U.S.C. § 1675c(d)(2).[1] The language of the Byrd Amendment thus requires that the published list provide notice to all potentially eligible affected domestic producers so that they can then comply with the mandatory certification procedures.

In concluding that the Byrd Amendment does not require notice to all potentially eligible producers, the majority affords <u>Skidmore</u> deference to the ITC's interpretation of the statute as not requiring such notice. <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 139-40 (1944). But, even under the more deferential standard of <u>Chevron</u>, deference to an

---

[1] In order to obtain a distribution, the certification must include: a statement of the producer's desire to receive a distribution; demonstration of their eligibility to receive the distribution as an affected domestic producer; and the qualifying expenditures incurred by the producer during the relevant distribution period. 19 U.S.C. § 1675c(d)(2); <u>see also</u> 19 C.F.R. § 159.63(a).

04-1083                                              2

agency interpretation is only required if the statute is ambiguous.  Chevron U.S.A. Inc. v. Natural Res. Def. Council, 467 U.S. 837, 842-43 (1984).   The majority makes no real effort to show that the Byrd Amendment is ambiguous; and, of course, it is not.

At the end of the day, the majority justifies its result by finding that section 777 conflicts with the Byrd Amendment.  But there is no conflict.  Section 777 of the Tariff Act of 1930, 19 U.S.C. § 1677f, prohibits disclosure of information "designated as proprietary by the person submitting the information" absent consent.   19 U.S.C. § 1677f (b)(1)(A) (2000).  The plain language of section 777 does not require that the identity of affected domestic producers who supported antidumping petitions be kept confidential unless confidentiality was waived.  Much less does it require that these names be kept confidential when the Byrd Amendment requires their disclosure.  The supposed conflict with the Byrd Amendment arises solely because the ITC has interpreted section 777 to protect the identity of the supporting parties even in those situations where the Byrd Amendment requires disclosure.  The majority defers to that interpretation under Chevron and finds that the Byrd Amendment must give way.  In other words, the majority reaches the somewhat astonishing conclusion that the agency's interpretation of section 777 impliedly takes precedence over the explicit provisions of the Byrd Amendment.  Maj. Op. ante at 16.

By allowing an agency interpretation of section 777 to trump the plain language of the Byrd Amendment, the majority contravenes this court's obligation to interpret the ambiguous language of section 777 so as to accommodate the explicit notice requirement of the Byrd Amendment.

04-1083                                    3

In the <u>Nextwave</u> case, the Supreme Court held in similar circumstances that the explicit command of the Bankruptcy Code overcame the agency's interpretation of the Communications Act. 537 U.S. at 304. The question was whether the agency could properly cancel auctioned licenses for failure to make timely payment. Contrary to the majority's claim that the case involved the construction of a single statute, Maj. Op. <u>ante</u> at 22, <u>Nextwave</u> also involved a potential conflict between two statutory provisions. The Court noted the express language of Section 525 of the Bankruptcy Code, that a "governmental unit may not revoke a license to a person that is a debtor under this title solely because such debtor has not paid a debt that is dischargeable in the case under this title," 537 U.S. at 300, (quoting 11 U.S.C. § 525(a) (2000) (ellipses omitted)), and held that nothing in the relevant section of the Communications Act, 47 U.S.C. § 309(j), compelled automatic cancellation of a license for failure to meet payment deadlines, <u>id.</u> at 304. The agency's interpretation of the Communications Act to require cancellation could not prevail because "[s]uch administrative preferences cannot be the basis for denying respondent rights provided by the plain terms of a law." <u>Id.</u>

So here, we have a situation where the Byrd Amendment is explicit; and section 777 contains no explicit requirement of confidentiality as to the identity of persons supporting antidumping petitions. The Byrd Amendment's explicit notice requirement cannot be defeated by an "administrative preference" for interpreting section 777 to require confidentiality in such circumstances. None of the courts of appeals cases cited

04-1083                                        4

by the majority found an implied repeal of a statutory command based on a <u>Chevron</u> interpretation of a second statute. Maj. Op. <u>ante</u> at 23 n.1.[2]

The majority's reliance on <u>Traynor v. Turnage</u>, 485 U.S. 535 (1988), is further manifestation of its failure to appreciate that an agency's policy-driven interpretation under <u>Chevron</u> cannot override the clear command of a conflicting statute. <u>Traynor</u> did not involve <u>Chevron</u> deference to the VA's interpretation of section 1662(a)(1) to include primary alcoholism as "willful misconduct," but rather an explicit holding that the statute itself incorporated a previously rendered agency interpretation to that effect.[3] Under

---

[2] In two of the cited cases, the agency adopted an interpretation of an ambiguous statute to avoid a conflict with another explicit statutory command. <u>See</u> <u>Mowbray v. Kozlowski</u>, 914 F.2d 593, 600-01 (4th Cir. 1990) (agency interpretation of section 303(3) of the Medicare Catastrophic Coverage Act avoided potential conflict with section 209(b) of the Supplemental Security Income Program. 42 U.S.C. §§ 1381 <u>et seq.</u>); <u>Rembold v. Pacific First Federal Savings Bank</u>, 798 F.2d 1307, 1310 (9th Cir. 1986) (agency interpretation of the National Housing Act's judicial review provisions avoided conflict with the explicit grant of district court jurisdiction provide under the antifraud provisions of the Security Exchange Act of 1934). Under the logic of those cases, the agencies should interpret section 777 to prevent a conflict with the Byrd Amendment. In the third case, the court found that an agency interpretation of one statute was permissible because it did not conflict with an explicit command of the second statute. <u>Beckert v. Our Lady of Angels Apartments, Inc.</u>, 192 F.3d 601, 607 (6th Cir. 1999) (agency interpretation of funding mechanism and implementation standards of § 202 of the National Housing Act was found to create <u>no</u> conflict with the general prohibitions against discrimination contained in the Fair Housing Act Amendments of 1988).

[3] As the Court noted:

[W]e must assume that Congress was aware of the Veterans' Administration's interpretation of "willful misconduct" at the time that it enacted § 1662(a)(1), and that Congress intended that the term receive the same meaning for purposes of that statute as it had received for purposes of other veterans' benefits statutes. . . . In these cases, however, we need not rely only on such assumptions. The legislative history confirms that Congress intended that the Veterans' Administration apply the same test of "willful misconduct" in granting extensions of time under

---

04-1083                                              5

these circumstances the Court gave primacy to the explicit Congressional intent manifested in section 1662(a)(1) as opposed to the more general provisions of the Rehabilitation Act, finding that the latter legislation neither "implicitly repealed the willful misconduct provision of the 1977 legislation [nor] forbade the VA to classify primary alcoholism as willful misconduct." Id. at 547. Here, the agency interpretation of section 777 was not incorporated into the statute, and can claim only Chevron deference. That is not sufficient to override the commands of the Byrd Amendment.

If the required notice was not provided, the agency cannot enforce the time limit. See Wood v. Office of Pers. Mgmt., 241 F.3d 1364, 1366 (Fed. Cir. 2001) (refusing to deny annuity benefit when statutorily required notice was not provided, even though employee had not formally elected the benefit during the prescribed time period). Here, the statutorily required notice was not provided, and the time limit cannot be enforced.

---

§ 1662(a)(1) as the agency already was applying in granting disability compensation . . . . Specifically, the [Senate Report] states:

> "In determining whether the disability sustained was a result of . . . 'willful misconduct,' the Committee intends that the same standards be applied as are utilized in determining eligibility for other VA programs . . . . In this connection, see 38 CFR, part III, paragraphs 3.1(n) and 3.301, and VA Manual M21-1, section 1404." S. Rep. No. 95-468, pp. 69-70 (1977).

The cited regulations . . . characterize[] primary alcoholism as "willful misconduct."

Traynor, 485 U.S. at 546 (some internal citations omitted).