# United States Court of Appeals for the Federal Circuit

05-1025, -1041

MOTOROLA, INC,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.


Michael E. Roll, Pisani & Roll, of Los Angeles, California, argued for plaintiff-cross appellant. Of counsel were Mark S. Zolno and William R. Rucker.

Amy M. Rubin, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of New York, New York, argued for defendant-appellant. With her on the brief were Peter D. Keisler, Assistant Attorney General and David M. Cohen, Director; and Barbara S. Williams, Attorney in Charge, International Trade Field, Office, of New York, New York. Of counsel on the brief was Chi S. Choy, Attorney, Office of Assistant Chief Counsel, United States Customs and Border Protection.

Appealed from: United States Court of International Trade

Senior Judge Nicholas Tsoucalas

# United States Court of Appeals for the Federal Circuit

05-1025,-1041

MOTOROLA, INC.,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

_____

DECIDED:  February 1, 2006

_____

Before LOURIE, RADER, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

This appeal from the Court of International Trade concerns the appropriate tariff classification for eight models of circuits used in battery packs for cellular phones. Motorola imported the circuits in 1998 and declared them to Customs under subheading 8542.40.00 of the Harmonized Tariff Schedule of the United States ("HTSUS"). That subheading covers "hybrid integrated circuits" and allows such circuits to be entered duty free.

After reviewing the entries, Customs rejected Motorola's proposed classification and liquidated the entries in October of 2000 under subheading 8536.30.80. That subheading covers "other apparatus for protecting electrical circuits" and carries a duty rate of 3.2 percent ad valorem. Customs based its decision on a May 1, 2000,

Headquarters Ruling, HQ 961050, which was issued in response to an earlier protest by Motorola concerning different circuits.

Motorola protested Customs' decision to classify the eight circuit models under subheading 8536.30.80. After Customs denied the protest, Motorola filed this action in the Court of International Trade. Following full briefing, the court issued a ruling in which it granted part of the relief Motorola sought. Motorola, Inc. v. United States, 350 F. Supp. 2d 1057 (Ct. Int'l Trade 2004).

At the outset, the court rejected Motorola's challenge to the classification decision, agreeing with Customs that all eight models were properly classified under subheading 8536.30.80. However, the court agreed with Motorola that Customs' previous liquidation of more than 900 entries of similar circuits as "hybrid integrated circuits" under duty-free subheading 8542.40.00 constituted the "treatment" of those goods as "hybrid integrated circuits" within the meaning of 19 U.S.C. § 1625(c)(2). That statute obligates Customs to publish for notice and comment any interpretive ruling or decision that would "have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions." Because Customs failed to comply with that statutory requirement, the court held that Customs could not depart from the treatment Customs had previously accorded to substantially identical circuits.

With respect to four of the eight models at issue, the court held that the Headquarters Ruling on which Customs relied had the effect of modifying the treatment previously accorded to substantially identical transactions, and that Customs therefore violated section 1625 by failing to publish that ruling for notice and comment before applying it to Motorola. The court held, however, that the other four circuit models were

05-1025,-1041                                    2

not "substantially identical" to the circuits that had been entered previously, and therefore that Customs did not violate section 1625(c)(2) by applying the Headquarters Ruling to those circuits. As a result, the court ruled that entries of the four circuit models that were "substantially identical" to the models that had been admitted on a duty-free basis had to be liquidated duty free, while the other four circuit models could be classified under subheading 8536.30.80 and assessed a duty of 3.2 percent.

Each party appeals from those aspects of the judgment unfavorable to it. We affirm the court's decision upholding Customs' classification of Motorola's circuits, but we vacate the court's decision that Customs violated 19 U.S.C. § 1625(c)(2) with respect to some of the circuits at issue and remand for further proceedings.

I

The first issue is whether the trial court erred in upholding the classification of the subject circuits under HTSUS subheading 8536.30.80 rather than subheading 8542.40.00. Motorola contends that all eight of the circuits at issue in this case should have been classified under subheading 8542.40.00.

Note 5 to Chapter 85 of the HTSUS provides that "headings 8541 and 8542 shall take precedence over any other heading in the tariff schedule which might cover [the subject goods]." Thus, if Motorola is correct that heading 8542.40.00 is an appropriate subheading for its eight subject circuits, the circuits should have been classified under that subheading, even if they might also have been covered by another subheading.

Heading 8542 covers "Electronic integrated circuits and microassemblies; parts thereof." Subheading 8542.40.00 covers "Hybrid integrated circuits." Note 5(b)(ii) of chapter 85 of the HTSUS defines the terms in the heading and subheading as follows:

5. For the purposes of headings 8541 and 8542:

. . .

       (b) "Electronic integrated circuits and microassemblies" are:

         (i)  Monolithic integrated circuits . . . .

         (ii) Hybrid integrated circuits in which passive elements (resistors, capacitors, interconnections, etc.) obtained by thin- or thick-film technology and active elements (diodes, transistors, monolithic integrated circuits, etc.) obtained by semiconductor technology, are combined to all intents and purposes indivisibly, on a single insulating substrate (glass, ceramic, etc.). These circuits may also include discrete components.

         (iii) Microassemblies . . . .

HTSUS, ch. 85 (1998). The parties' disagreement as to whether Motorola's circuits fit within the Note's definition of "hybrid integrated circuits" focuses on the requirement that the active and passive elements be "combined to all intents and purposes indivisibly, on a single insulating substrate."

In the Headquarters Ruling on which it relied in this case, Customs determined that the Motorola circuits there at issue were not "hybrid integrated circuits" because they did not meet the "combined . . . indivisibly" requirement. The Headquarters Ruling looked to the Explanatory Notes to the HTSUS, which define the phrase in the HTSUS as follows:

> The components forming a hybrid integrated circuit must be combined <u>to all intents and purposes indivisibly</u>, i.e. though some of the elements could theoretically be removed and replaced, this would be a long and delicate task which would be uneconomic under normal manufacturing conditions.

4 World Customs Org., <u>Explanatory Notes</u>, Note 8542(I)(2)(b), at 1700 (3d ed. 2002) (emphasis in original). The Headquarters Ruling interpreted the Explanatory Notes to require that the passive elements of the circuit be produced directly on the substrate of

the circuit, "in the mass before the semiconductors and discrete components are added to the substrate." The Headquarters Ruling explained:

> Legal note 5(B)(b) requires an HIC [hybrid integrated circuit] to contain passive film components, and according to the EN [Explanatory Notes], they must be produced in the mass. We believe the drafters of the [HTSUS] intended the legal note and the EN to be read as a whole, one supporting the other. To that end, we interpret the [HTSUS's] definition of an HIC as formed by layering a thin or thick film circuit, in the mass (nondiscrete) directly on top of the substrate. Stated another way, an HIC begins with a printed circuit produced through film technology, see chapter 85 legal note 4 and the EN to heading 8534, to which are added components produced through semiconductor technology.

HQ 961050 (May 1, 2000).

Customs determined that the Headquarters Ruling was applicable to the eight circuit models at issue in Motorola's protest, and it denied Motorola's protest on that ground. The trial court agreed with Customs' classification decision. The court explained that "whether or not Motorola actually removes or replaces some of the components forming the subject merchandise is irrelevant. The definition of hybrid integrated circuits does not contemplate the actions of a single manufacturer or importer." While Motorola "does not remove or replace the components from the substrate or have the intention to do so," the court concluded that Motorola had failed to offer evidence that it was "uneconomical or impractical to remove or replace the components from the substrate." Accordingly, the court held that Customs had properly classified the circuits under heading 8536 of the HTSUS.

Motorola argues that the Headquarters Ruling on which Customs' analysis was based was legally flawed because the trial court relied on limiting language from the Explanatory Notes requiring that the passive elements be formed directly on the substrate in order for a circuit to be classifiable as a "hybrid integrated circuit." This

court has described the Explanatory Notes to the HTSUS as instructive, but not binding. See, e.g., Rubie's Costume Co. v. United States, 337 F.3d 1350, 1359 (Fed. Cir. 2003); Marubeni Am. Corp. v. United States, 35 F.3d 530, 535 n.3 (Fed. Cir. 1994). However, we do not interpret the trial court's opinion to have treated the Explanatory Note as binding.

The trial court based its ruling not on an extra definitional element imported from the Explanatory Notes, but rather on the definitional statement in Note 5(b)(ii) that the components in a hybrid integrated circuit must be "combined to all intents and purposes indivisibly." In interpreting that definitional language, the court looked for guidance to the Explanatory Note, which explains that the quoted language means that "though some of the elements could theoretically be removed and replaced, this would be a long and delicate task which would be uneconomic under normal manufacturing conditions." 4 Explanatory Notes at 1700. As the trial court explained:

> The Explanatory Note indicates that the indivisibility element is measured by whether it is uneconomical or impractical to remove or replace the components from the substrate. In the present case, Motorola has failed to present evidence indicating that the subject merchandise meet this requirement.

Because the court used the Explanatory Note for guidance as to the meaning of a definitional term and did not treat the Explanatory Note as setting forth an additional definitional requirement, we conclude that the trial court did not commit legal error by referring to the Explanatory Note.

The question that remains is whether the evidence established that Motorola's circuits satisfied the "combined to all intents and purposes indivisibly" requirement set forth in Note 5(b)(ii). We agree with the trial court that it did not. Motorola's evidence

on this point consisted of a report, an affidavit, and testimony by its employee Russell Gyenes describing Motorola's manufacturing process. Mr. Gyenes stated that the elements of the subject circuits are combined using reflow solder, and that Motorola does not generally repair such circuits when they are defective, because Motorola's production process has a low defect rate and because the circuits are very inexpensive, costing about one dollar each. To remove the soldered components, Mr. Gyenes stated, would require extra equipment and training, and it would risk damaging the parts through exposure to static electricity. Customs' expert did not contradict Mr. Gyenes, but stated that reflow solder is a well-known means of combining circuit elements and that Motorola's circuits could be disassembled easily using readily available technology.

Mr. Gyenes' evidence merely established that in light of its quality controls and weighing of costs, Motorola found it unprofitable to remove and replace components of its circuits, but instead simply discarded any circuits that were defective. As the trial court held, however, the definitional language of Note 5(b)(ii)—"a long and delicate task which would be uneconomic under normal manufacturing conditions"—is objective. Although evidence concerning what Motorola does with particular circuits in its manufacturing process may be marginally probative, it does not establish whether those circuits meet the objective definition of "hybrid integrated circuits." In light of the evidence from Customs' expert that the subject circuits could be readily disassembled, the trial court properly concluded that Motorola had not met its burden in challenging the tariff classification. See 28 U.S.C. § 2639(a)(1) (placing the burden of proof on the party challenging a tariff classification). We therefore uphold the court's decision regarding the classification issue.

The second issue is whether some or all of the circuits at issue in this case should be entered duty free on the ground that Customs had previously treated the same or similar circuits as eligible for duty-free entry. Motorola argues that because Customs had previously treated the same or similar circuits as duty free and had not published its contrary Headquarters Ruling, HQ 961050, for notice and comment, it was required under 19 U.S.C. § 1625(c)(2) to accord duty-free treatment to the circuits at issue in this case. The trial court agreed with Motorola as to four of the eight circuit models, but not as to the other four.

A

On October 22, 1992, and February 4, 1994, Customs issued two preclassification ruling letters ("PRLs") to Motorola. A PRL is a letter from Customs to an importer advising the importer of the tariff classifications for certain of the importer's goods before the importer brings them into the country. Customs issues PRLs in response to written requests from importers or other parties. 19 C.F.R. §§ 177.1, 177.2(a), (b)(2)(ii). The two PRLs that Customs sent to Motorola listed several of Motorola's circuits by their specific part numbers, and for each part number, the PRL indicated a tariff classification. Both PRLs classified particular circuits under HTSUS 8542.20.00, the predecessor to the current subheading 8542.40.00. Like its successor, subheading 8542.20.00 provided duty-free entry for "hybrid integrated circuits."

Also relevant to this appeal is a series of entries Motorola made between 1995 and 1997. During that period, Motorola imported circuits similar in some respects to the circuits at issue in this case. Customs liquidated those entries pursuant to what

Customs refers to as its "bypass" procedures. Under the bypass procedures, according to Customs, importers declare a value and tariff classification for their goods when they import them; Customs port directors may liquidate the goods as declared, without inspecting the goods or otherwise independently determining the proper duty to be paid.[1] Motorola made more than 900 entries during the pertinent period pursuant to the bypass procedures. Those entries were declared and liquidated duty free under HTSUS subheading 8542.40.00.

In 1996, the Customs Port Director in Chicago reviewed 92 of the Motorola "bypass" entries and determined that the circuits in those entries should be classified under HTSUS subheading 8507.90.80, a residual subheading under the general heading for "electric storage batteries." Goods classified under that subheading are not entered duty free. After Customs liquidated the 92 entries in May of 1997, Motorola protested, arguing that the entries should have been classified under subheading 8542.40.00. In response to Motorola's protest, Customs issued HQ 961050, but it did not publish the ruling for notice and comment. Although Customs denied Motorola's protest, it disagreed with both Motorola and the port director as to the proper

---

[1]    Neither party points to an explicit definition of the "bypass" procedures, either in the regulations or elsewhere. The trial court disagreed with Customs' characterization of bypass as "not involv[ing] any action performed by Customs," and cited G&R Produce Co. v. United States, 281 F. Supp. 2d 1323, 1333 (Ct. Int'l Trade 2003), for the proposition that "to place an entry on 'bypass status' requires Customs to perform some action in reviewing a tariff classification."

classification of the goods and classified the 92 entries under HTSUS subheading 8536.30.80 at a 3.2 percent <u>ad valorem</u> duty rate.[2]

At the time HQ 961050 issued, Motorola had entered the circuits at issue in this case under HTSUS subheading 8542.40.00, but Customs had not yet liquidated those entries. In October of 2000, based on HQ 961050, Customs liquidated the entries under HTSUS subheading 8536.30.00. That action forms the basis for the dispute in this case.

B

19 U.S.C. § 1625(c) provides:

A proposed interpretive ruling or decision which would--
(1) modify (other than to correct a clerical error) or revoke a prior interpretive ruling or decision which has been in effect for at least 60 days; or
(2) have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions;
shall be published in the Customs Bulletin. The Secretary shall give interested parties an opportunity to submit, during not less than the 30-day period after the date of such publication, comments on the correctness of the proposed ruling or decision. After consideration of any comments

---

[2]    There is no overlap among (1) the parts that Customs classified under the PRLs, (2) the parts that Motorola entered on "bypass" status between 1995 and 1997, and (3) the parts at issue in this case. The part numbers, which are listed in an affidavit of Motorola's witness Russell Gyenes, are as follows:

| This case | Bypass entries 1995-1997 | PRL 894316 (Feb. 4, 1994) | PRL 878763 (Oct. 22, 1992) |
|---|---|---|---|
| 5108189Z16 | 5104286T01 | 5015189R29 | 5015189R07 |
| 5180569A02 | 5104717T01 | 5015189R37 | 5015189R14 |
| 5180572T01 | 5104847T01 | 5015189R48 | 5015189R21 |
| 5104035T03 | 5104918T02 | 5015189R49 | 5015189R24 |
| 5104091T01 | 5104918T03 | 5015189R54 | 5015189R28 |
| 5180569A03 | 5105189R20 | 5015189R75 | 5015189R30 |
| 5180581T02 | 5105189R57 | | |
| 5180649T02 | 5105189Z17 | | |
| | 5105189Z28 | | |
| | 5186210A01 | | |

received, the Secretary shall publish a final ruling or decision in the Customs Bulletin within 30 days after the closing of the comment period. The final ruling or decision shall become effective 60 days after the date of its publication.

In the trial court, Motorola first argued that HQ 961050 modified or revoked the two PRLs issued to Motorola in 1992 and 1994, and that Customs therefore violated section 1625(c)(1) by liquidating its goods under a different subheading without publishing the Headquarters Ruling for notice and comment. The court held that, although the PRLs were "interpretive ruling[s] or decision[s]" within the meaning of the statute, the Headquarters Ruling did not modify or revoke them because by their terms PRLs apply and bind Customs "only with respect to the items identified in the PRLs and not any other merchandise, even if [the other merchandise] is substantially identical." Neither party has appealed that part of the court' s judgment.

Motorola also argued in the trial court that liquidating its entries without publishing HQ 961050 violated Section 1625(c)(2) because it had the effect of modifying a "treatment previously accorded by the Customs Service to substantially identical transactions." Specifically, Motorola argued that (1) the PRLs described above constituted a "treatment" of "substantially identical transactions," and (2) Customs' liquidation of more than 900 entries of similar circuits on bypass status constituted "treatment" of "substantially identical transactions."

The trial court did not directly address whether the PRLs constituted "treatment" of "substantially identical transactions" for purposes of section 1625(c)(2). It did hold, however, that Customs' liquidation of Motorola's bypass entries constituted "treatment." Moreover, the court held that those liquidations were "substantially identical transactions" as to four of the eight circuit models at issue in this case. But it held that

those liquidations were not "substantially identical transactions" as to the other four circuit models. Customs appeals the court's ruling that the bypass liquidations constituted a treatment, and Motorola appeals the court's ruling that four of its circuits were not "substantially identical" to the circuits entered and liquidated on bypass status between 1995 and 1997.

1

In deciding that Customs' liquidation of more than 900 of Motorola's bypass entries constituted "treatment" within the meaning of section 1625(c)(2), the trial court rejected Customs' argument that the court should look to 19 C.F.R. § 177.12(c)(1)(ii) to determine the meaning of the term "treatment" and should defer to the agency's construction of the statute pursuant to Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Based on the decision in Precision Specialty Metals, Inc. v. United States, 116 F. Supp. 2d 1350 (Ct. Int'l Trade 2000), the court held that the term "treatment" denotes a pattern of actions by Customs, as opposed to its articulated policies or positions. Moreover, because the court concluded that the term is unambiguous, it held that Customs' regulation was not entitled to Chevron deference. Because the court disagreed with Customs' contention that liquidation of bypass entries does not entail "action" on Customs' part, it held that the liquidations constituted "treatment." On appeal, Customs argues that this analysis was incorrect. It argues that the word "treatment" in the statute is ambiguous, that 19 C.F.R. § 177.12(c)(1)(ii) contains a permissible construction of the statute that is entitled to Chevron deference, and that the bypass liquidations do not involve action on Customs' part sufficient to constitute "treatment" under the regulation.

The first step of the <u>Chevron</u> analysis requires the court to determine whether the statutory term in question is unambiguous. Under <u>Chevron</u>, a court decides the statutory construction issue without deference if the court determines that "Congress has directly spoken to the precise question at issue." <u>Chevron</u>, 467 U.S. at 842-43 & n.9; <u>Cathedral Candle Co. v. U.S. Int'l Trade Comm'n</u>, 400 F.3d 1352 (Fed. Cir. 2005). Motorola cites dictionaries and the analysis of the Court of International Trade in <u>Precision Specialty Metals</u> for the proposition that the word "treatment" is unambiguous and that deference to the agency's construction of that term is therefore inappropriate.

<u>Precision Specialty Metals</u> involved a number of drawback entries that were liquidated over a four-and-a-half-year period. The parties disputed whether the liquidation of Precision's drawback entries constituted "treatment." Noting that the legislative history "offers no guidance," the court ruled that the word "treatment" denotes a consistent pattern of actions, and it construed the statutory term to mean that "importers may order their actions based not only on Customs' formal policy, 'position,' 'ruling,' or 'decision,' but on its prior actions." 116 F. Supp. 2d at 1044.

While that definition may be useful as a starting point, it does not answer the precise question presented here, which is whether bypass entries of the sort at issue in this case involve a sufficient degree of action by Customs to constitute "treatment." When Customs liquidates bypass entries without inspecting the goods, it may be said to have "acted" in the sense that it has chosen not to scrutinize the entries more closely, but it is not clear on the face of the statute that Customs has "treated" the goods as being what the importer says they are. The question of what degree of action (as opposed to acquiescence) is sufficient to bind Customs is not an issue that Congress

directly addressed. We therefore hold that the trial court erred in holding that the word "treatment" was unambiguous, and we proceed to the second step of the <u>Chevron</u> analysis.

In step two of <u>Chevron</u>, a court must determine whether the agency's answer to the question at issue is "based on a permissible construction of the statute." <u>Chevron</u>, 467 U.S. at 843; <u>see also</u> <u>United States v. Haggar Apparel Co.</u>, 526 U.S. 380, 385-86 (1999); <u>Cathedral Candle</u>, 400 F.3d at 1362. At the outset, we note that 19 U.S.C. § 1624 empowers Customs to make "rules and regulations" to implement section 1625, and that 19 C.F.R. § 177.12 was promulgated through notice-and-comment rulemaking.[3] Such a formal expression of an agency's interpretation of a statute that it administers is normally entitled to <u>Chevron</u> deference. <u>See</u> <u>Barnhart v. Walton</u>, 535 U.S. 212, 221-22 (2002); <u>United States v. Mead Corp.</u>, 533 U.S. 218, 229 (2001). Turning to the text of the regulation itself, we believe that the agency's answer to the specific question at issue is a reasonable and permissible construction of the statute. Tracking the language of the statute, 19 C.F.R. § 177.12(c) is labeled "[t]reatment previously accorded to substantially identical transactions." Section 177.12(c)(1)(ii) states that

> [t]he determination of whether the requisite treatment occurred will be made by Customs on a case-by-case basis and will involve an assessment of all relevant factors. In particular, Customs will focus on the past transactions to determine whether there was an examination of the merchandise (where applicable) by Customs or the extent to which those transactions were otherwise reviewed by Customs to determine the proper

---

[3]    <u>See</u> 66 Fed. Reg. 37370, 37387-89 (July 17, 2001) (proposing the regulation with others as section 177.21); 67 Fed. Reg. 53483 (Aug. 16, 2002) (responding to comments and publishing the final rule, renumbered as section 177.12).

application of the Customs laws and regulations. For purposes of establishing whether the requisite treatment occurred, Customs will give diminished weight to transactions involving small quantities or values, and Customs will give no weight whatsoever to informal entries and to other entries or transactions which Customs, in the interest of commercial facilitation and accommodation, processes expeditiously and without examination or Customs officer review.

The regulation no doubt advantages Customs by giving it the power to process transactions through expedited procedures without binding itself to a "treatment" of the goods processed in that manner. We believe, however, that Customs' construction is a permissible one in light of the ambiguity of the term "treatment" as it applies to the issue presented in this case, i.e., entries liquidated under Customs' "bypass" procedures. The regulation permissibly focuses on "whether there was an examination of the merchandise . . . or the extent to which [the] transactions were otherwise reviewed by Customs," and gives no weight to transactions in which Customs did not examine the goods in question.[4] It is reasonable to conclude that goods which are admitted pursuant to representations by the importer and are not independently examined or reviewed by the importer are not "treated" by Customs as classifiable under the category assigned to them. This portion of the regulation is therefore "based on a permissible construction of the statute" and warrants deference. Chevron, 467 U.S. at 842-43.

It makes no difference to our analysis that the regulation was promulgated in 2002, after the controversy arose and after this litigation began. So long as an agency's interpretation of a statute is not a "post hoc rationalization . . . seeking to defend past

---

[4] Customs' response to comments on the originally proposed version of the regulation reflects the agency's concern with placing an unduly limiting construction on the statute. See 67 Fed. Reg. 53483, 53492 (Aug. 16, 2002).

05-1025,-1041                                         15

agency action against attack," <u>Auer v. Robbins</u>, 519 U.S. 452, 462 (1997), or "wholly unsupported by regulations, rulings or administrative practice," <u>Smiley v. Citibank (S. Dak.), N.A.</u>, 517 U.S. 735, 741 (1996) (quoting <u>Bowen v. Georgetown Univ. Hosp.</u>, 488 U.S. 204, 212 (1988)), <u>Chevron</u> deference is due even if the adoption of the agency's interpretation postdates the events to which the interpretation is applied.

Accordingly, we hold that the trial court erred in refusing to give <u>Chevron</u> deference to the interpretation of the word "treatment" provided in 19 C.F.R. § 177.12(c)(1)(ii). We do not address the validity of the entire regulation for all purposes, but merely defer to its determination that the admission of entries "expeditiously and without examination or Customs officer review" does not constitute "treatment" within the meaning of section 1625(c)(2).[5] On remand, the trial court will have to address whether the particular bypass entries at issue in this case were processed without review or examination by Customs, and thus fall within the scope of the regulation, or whether the goods were examined or the entries otherwise reviewed in a manner that would take them out of the reach of the regulation.

2

As noted above, while the trial court held that Customs' liquidation of more than 900 bypass entries constituted a treatment, it did not rule on the status of the two PRLs that Customs issued in 1992 and 1994. The court acknowledged that Motorola raised that issue, and it gave a detailed summary of the contentions of both Motorola and Customs. Further, the court noted Customs' concession that four of the eight parts at

---

[5] This court has reached a different conclusion with regard to a different portion of the regulation as applied to a different issue under 19 U.S.C. § 1625(c). <u>See</u> <u>Cal. Indus. Prods., Inc. v. United States</u>, No. 05-1087, decided today.

issue in this case are "substantially identical" both to parts liquidated on "bypass status" and to parts identified in the PRLs. The court, however, did not decide whether the PRLs, or the importation of goods pursuant to the PRLs, constituted "treatment." Because this argument was raised below and not addressed, and because it may affect the disposition of the case in light of our decision to vacate the court's holding with respect to the "bypass" entries, the trial court should decide this issue on remand.

III

Motorola also challenges the trial court's ruling that the four parts at issue in this case that were used with lithium chemistry batteries were not "substantially identical" to the parts entered on "bypass" between 1995 and 1997. The result of the court's ruling on this issue was that, for those four parts, Motorola was denied the benefit of a prior "treatment previously accorded by the Customs Service to substantially identical transactions" under section 1625(c)(2). Motorola argues that the court essentially required outright identity between the parts instead of "substantial" identity, and it contends that the evidence it presented proved substantial identity under the correct legal standard.

We do not believe that the trial court applied the wrong legal standard. In support of its argument, Motorola points to a portion of the court's opinion in which the court stated that "[a]lthough the Lit[h]ium-ion Chemistry Assemblies and the Nickel Assemblies may be made in much the same manner and serve similar purposes, the two sets of assemblies fall short of being identical." On the same page of the opinion, however, the court noted that "Motorola correctly asserts that to determine whether

'substantially identical transactions' exist, the test is 'substantial' and not 'exact.'" The trial court does not appear to have been mistaken about the rule to be applied.

Motorola further urges that this court should reverse the trial court on that issue, because the differences between the lithium chemistry parts and the bypass entry parts are no greater or more significant than the differences between the nickel chemistry parts and the bypass entry parts, and that Customs conceded that the latter set of differences did not defeat substantial identity. In light of Customs' evidence as to the nature of the various circuits, however, it was reasonable for the trial court to hold that the nickel chemistry parts were "substantially identical" to the bypass parts, but that the lithium chemistry parts were not. We therefore affirm that aspect of the trial court's judgment.

IV

For the reasons stated above, we affirm the trial court's holding that Customs correctly classified all of the parts at issue under the Harmonized Tariff Schedule of the United States. We also affirm the court's holding that four of the eight parts at issue in this case were not "substantially identical" to the parts that Customs liquidated on bypass. We vacate the court's ruling that Customs violated 19 U.S.C. § 1625(c)(2), and we remand the case for the court to address whether either the 900 "bypass" entries or the PRLs constituted "treatment" within the meaning of section 1625(c)(2), as interpreted in light of 19 C.F.R. § 177.12(c)(1)(ii).

<u>AFFIRMED IN PART, VACATED IN PART, AND REMANDED</u>.