**Slip Op. 06-165**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS**

_____
                                        :
MOTOROLA, INC.,                         :
                                        :
            Plaintiff,                  :
                                        :   Court No.
            v.                          :   01-00126
                                        :
UNITED STATES,                          :
                                        :
            Defendant.                  :
                                        :
_____:


**Held**: Plaintiff's motion for summary judgment denied.  Defendant's cross-motion for summary judgment granted.  Final judgment entered for Defendant.


                                        November 13, 2006


     Pisani & Roll, (Michael E. Roll)(Mark S. Zolno, of counsel) for Motorola, Inc., Plaintiff.

     Peter D. Keisler, Assistant Attorney General; Barbara S. Williams, Attorney-in-Charge, International Trade Field Office, Amy M. Rubin, Commercial Litigation Branch, Civil Division, United States Department of Justice; of counsel, Chi S. Choy, Office of the Assistant Chief Counsel, International Trade Litigation, United States Bureau of Customs and Border Protection, for the United States, Defendant.


                        **OPINION**

**TSOUCALAS, Senior Judge:**    This case is before the Court pursuant to a remand ordered by the United States Court of Appeals for the Federal Circuit ("CAFC") in Motorola, Inc. v. United States, 436 F.3d 1357 (Fed. Cir. 2006)("Motorola II").   Therein, the CAFC mandated that this Court determine "whether either the 900

'bypass' entries or the PRLs [preclassification ruling letters] constituted 'treatment' within the meaning of section 1625(c)(2), as interpreted in light of 19 C.F.R. § 177.12(c)(1)(ii)." Id. at 1368.  Thus, on remand, this Court will address whether the "entries at issue in this case were processed without review or examination by Customs, and thus fall within the scope of the regulation . . . ."  Id. at 1367.  For the reasons set forth below, the Court enters judgment for the United States ("Customs" or "Defendant").

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(a)(2000).

## DISCUSSION

**I.   Background**

The facts of this case have been set forth in the prior decisions of the CAFC and this Court.  See Motorola II, 436 F.3d 1357;  Motorola, Inc. v. United States, 28 CIT __, __, 350 F. Supp. 2d 1057 (2004)("Motorola I").[1]  The facts and procedural history relevant to the instant inquiry are as follows.

The merchandise initially at issue in Motorola I, was eight models of circuits used in battery packs for Motorola cellular

---

[1]     Familiarity with both of these decisions is presumed.

phones, entered between January and June of 1998. See Motorola II, 436 F.3d at 1358. Motorola, Inc. ("Plaintiff" or "Motorola") declared these entries to be duty free, classifiable as "hybrid integrated circuits" under subheading 8542.40.00 of the Harmonized Tariff Schedule of the United States ("HTSUS"). See id. In October 2000, the United States Customs Service[2] rejected Motorola's proposed classification and liquidated the merchandise under HTSUS subheading 8536.30.80, subject to a duty rate of 3.2 percent ad valorem. Id. Customs based this decision on Headquarters Ruling ("HQ") 961050, issued on May 1, 2000, in response to an earlier protest by Motorola concerning different circuits.[3] See id. HQ 961050 reflected that certain Motorola circuits were classifiable under HTSUS subheading 8536.30.80. See HQ 961050 (May 1, 2000). At the time HQ 961050 was issued, Motorola had entered the contested circuits under HTSUS subheading 8542.40.00. See Motorola II, 436 F.3d at 1358. Customs, however, had not yet liquidated those entries, and thus was able to

---

[2]     The United States Customs Service was renamed the Bureau of Customs and Border Protection of the Department of Homeland Security, effective March 1, 2003. See H.R. Doc. No. 108-32 (2003).

[3]     In 1996 the Customs Port Director in Chicago reviewed 92 of the 900 bypass entries and determined that they should be classified under a different HTSUS subheading, not providing for duty free entry. After Customs liquidated the 92 entries under the new subheading and with duty, Motorola protested. In response, Customs issued HQ 961050. See Motorola I, 350 F. Supp. 2d at 1060.

liquidate them under HTSUS subheading 8536.30.80. Plaintiff protested the classification, and Customs denied in full. Id. Thereafter, Motorola filed an action in this Court, the decision of which was appealed to the CAFC. Id.

In Motorola II, the Federal Circuit affirmed this Court's finding that the contested circuits are classifiable under HTSUS subheading 8536.30.80, not under 8542.40.00. See id. at 1368. The CAFC also affirmed this Court's holding that four of the eight contested circuits were not "substantially identical" to the circuit models that Customs liquidated on bypass. Id.

This remand, however, concerns more than 900 entries of circuits entered duty free through Customs' bypass procedure, and entries made pursuant to the two preclassification ruling letters ("PRLs"). The liquidation of these entries is relevant because Plaintiff contends that Customs violated the notice and comment provisions of 19 U.S.C. § 1625(c)(2000) ("the statute") when it issued HQ 961050. See Pl.'s Mem. Law Remand ("Pl.'s Mem.") at 1-3. This statute requires that Customs publish for notice and comment, any interpretative ruling or decision that would "have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions[.]" 19 U.S.C. § 1625(c).

In 1992 and 1994, Customs issued two PRLs to Motorola. A PRL

is a letter from Customs to the requesting party, advising the party of how the merchandise specified therein, will be classified upon entry. See Motorola II, 436 F.3d at 1362; see also 19 C.F.R. § 177.1, 177.2(a)(2006). In both letters sent to Motorola, Customs classified each part number specified in the PRL request under HTSUS subheading 8542.20.00, the predecessor to the current subheading 8542.40.00. Both subheading 8542.20.00 and its successor, provide for duty free entry into the United States. See Motorola II, 436 F.3d at 1362.

Then, between 1995 and 1997, Motorola made over 900 entries of circuits ("bypass entries") pursuant to Customs' bypass procedures. See id. Customs liquidated the majority of these entries duty free under HTSUS subheading 8542.40.00. See id.

Motorola contends that the issuance of the two PRLs, and the liquidation of the bypass entries each established a "treatment" that could only be modified in accordance with the notice and comment provisions of § 1625(c)(2). See Pl.'s Mem. at 3-10. On remand, the remaining issue, then, is whether the particular bypass entries at issue, or the goods imported pursuant to the PRLs were subject to "treatment" by Customs.

II.  **The Liquidation of the Bypass Entries at Issue Does Not
     Constitute Treatment Within the Meaning of 19 U.S.C.
     § 1625(c)(2) and 19 C.F.R. § 177.12(c)(1)(ii)**

First at issue is whether the entries liquidated under Customs' bypass procedures were subject to "treatment" for purposes of 19 U.S.C. § 1625(c).  In Motorola II, the CAFC vacated this Court's finding that the term "treatment" in § 1625(c)(2) was unambiguous, and thus, not entitled to Chevron deference.  See Motorola II, 436 F.3d at 1365-68.  Instead, the CAFC found that the word treatment is ambiguous, and that 19 C.F.R. § 177.12(c)(1)(ii) ("the regulation") contains a permissible construction of the statute, entitled to Chevron deference.  Id.  As result, on remand, this Court revisits its analysis of treatment in light of § 177.12(c)(1)(ii).  Id. at 1367.

As will be discussed infra, whether treatment has occurred depends upon the degree of review or examination by Customs.  Accordingly, the CAFC directed that this Court address "whether the particular bypass entries at issue . . . were processed without review or examination by Customs, and thus f[e]ll within the scope of the regulation, or whether the goods were examined or the entries otherwise reviewed in a manner that would take them out of the reach of the regulation."  Id.

## A. Contentions of the Parties

Motorola contends that the liquidation of the bypass entries qualifies as treatment under § 177.12(c)(2)(ii). See Pl.'s Mem. at 4. Specifically, it argues that Customs reviewed Motorola's bypass entries, and that the "Customs' Rule 30(b)(6) agent . . . confirmed that Customs <u>actually reviewed</u> entries put on bypass . . . ." <u>Id.</u> at 5 (emphasis in original). Motorola maintains that Customs has a "detailed procedure" for determining which entries are placed on bypass status. Inherent in this decision, Plaintiff claims, is a review of the entries in order to select which entries will be processed through bypass.[4] <u>Id.</u> at 5–6.

Customs responds that Motorola has failed to demonstrate that its bypass entries establish a treatment. See Def.'s Resp. Pl. Mem. Law Remand ("Def.'s Mem.") at 4–14. It sets forth several arguments as to why Plaintiff's proffered evidence does not support a finding that the entries at issue were reviewed. See id. For all that Motorola offers in support of its position, Customs' conclusion is the same: although Motorola's evidence may tend to show that there may have been some sort of review-like

---

[4] In its memorandum, although noting its perceived connection between the PRLs and the bypass entries, Plaintiff itself analyzes the bypass entries and PRLs separately. See Pl.'s Mem. at 9. During oral argument, however, counsel for Plaintiff set forth argument urging the Court to determine whether there had been treatment based on the PRLs and 900 bypass entries taken together. See generally Trans. Oral Arg. Oct. 27, 2006. The Court finds this argument unconvincing.

function of bypass entries, it is not the type of review that constitutes treatment, and there is no evidence that the particular entries at issue were actually reviewed.[5] The Court finds Customs' arguments to be convincing.

## B.   Analysis

### a.   Statutory and Regulatory Framework

The starting point of the Court's analysis is § 1625(c). This provision provides that:

> A proposed interpretive ruling or decision which would –
>
> > (1)   modify (other than to correct a clerical error) or revoke a prior interpretative ruling or decision which has been in effect for at least 60 days; or
> >
> > (2)   have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions;
>
> shall be published in the Customs Bulletin. The Secretary shall give interested parties an opportunity to submit, during not less than the 30-day period after the date of such publication, comments on the correctness of the proposed ruling or decision.   After consideration of any comments received, the Secretary shall publish a final ruling or decision in the Customs Bulletin within 30 days after the closing of the comment period. The final ruling or decision shall become effective 60 days after the date of its publication.

---

[5]   As the Court concurs with the majority of Customs' arguments it does not needlessly reiterate them in its opinion.

19 U.S.C. § 1625(c). Relevant to the instant matter, is the interpretation and application of subsection (c)(2) of the statute. To establish a violation of § 1625(c)(2), Plaintiff must show that: (1) an interpretative ruling or decision; (2) effectively modified; (3) a "treatment" previously accorded by Customs to "substantially identical transactions;" and (4) the interpretative ruling or decision had not been subject to the notice and comment process set forth in § 1625(c)(2).[6] See id.; see also Arbor Foods, Inc. v. United States, 30 CIT __, Slip Op. 06-74 at 8 (May 17, 2006) (not published in the Federal Supplement); Precision Speciality Metals, Inc. v. United States, 24 CIT 1016, 1040, 116 F. Supp. 2d 1350, 1374 (2000).

Because neither the statute, nor its legislative history define "treatment," in the past this Court has applied its ordinary meaning. See Precision Speciality Metals, 24 CIT at 1042, 116 F. Supp. 2d at 1376. In Precision Specialty Metals, the Court found that the term treatment denotes a consistent pattern of actions by Customs, and allows importers to order their behavior based on these prior actions. Id. at 1044 (holding that "importers may order their actions based not only on Customs' formal policy, 'position,' 'ruling,' or 'decision,' but on its

---

[6] It is undisputed that HQ 961050 is an interpretative ruling or decision, and that it was not published in the Customs Bulletin.

prior actions."). In <u>Motorola II</u>, however, although the CAFC found this definition to be a useful "starting point," it indicated that it, alone, did not answer the question presented herein, i.e., what degree of action constitutes treatment, and is sufficient to bind Customs. See <u>Motorola II</u>, 436 F.3d at 1365. (defining the issue as whether "bypass entries of the sort at issue in this case involve a sufficient degree of action by Customs to constitute "treatment."). Instead, the Court found that the term treatment in § 1625(c)(2) is ambiguous, and that 19 C.F.R. § 177.12(c)(1)(ii) contains a permissible construction of the statute entitled to <u>Chevron</u> deference. <u>Id.</u> at 1366. (citing <u>Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984)).

In order to reach its conclusion, the <u>Motorola II</u> Court engaged in <u>Chevron</u> analysis and explained that:

> When Customs liquidates bypass entries without inspecting the goods, it may be said to have 'acted' in the sense that it has chosen not to scrutinize the entries more closely, but it is not clear on the face of the statute that Customs has 'treated' the goods as being what the importer says they are. The question of what degree of action (as opposed to acquiescence) is sufficient to bind Customs is not an issue that Congress directly addressed.

<u>Id.</u> As a result, the Court held that the word treatment is ambiguous and proceeded to the second step of the <u>Chevron</u> analysis. <u>Id.</u> <u>Chevron</u> requires that the court determine whether

the agency's answer to the question presented, here § 177.12(c)(1)(ii), is based on a permissible construction of the statute. See, Chevron, 467 U.S. at 843. The CAFC indicated that, "[t]urning to the text of the regulation itself, we believe that the agency's answer to the specific question at issue is a reasonable and permissible construction of the statute." Motorola II, 436 F.3d at 1366. It found that it "is reasonable to conclude that goods which are admitted pursuant to representations by the importer and are not independently examined or reviewed . . . are not "treated" by Customs . . . ." Id. (emphasis added). Because the CAFC found Customs' interpretation of the word treatment to be reasonable, this Court may not substitute its own construction of the statutory provision. See Chevron, 467 U.S. at 843. As a result, the Court revisits its analysis of the word treatment, with the regulation as a guide.

The regulation, entitled "Treatment previously accorded to substantially identical transactions," provides, in relevant part, that:

> (ii) The determination of whether the requisite treatment occurred will be made by Customs on a case-by-case basis and will involve an assessment of all relevant factors. In particular, Customs will focus on the past transactions to determine whether there was an examination of the merchandise . . . by Customs or the extent to which those transactions were otherwise reviewed by Customs to determine the

proper application of the Customs laws and regulations. For purposes of establishing whether the requisite treatment occurred, Customs will give diminished weight to transactions involving small quantities or values, and Customs will give no weight whatsoever to informal entries and to other entries or transactions which Customs, in the interest of commercial facilitation and accommodation, processes expeditiously and without examination or Customs officer review[.]

§ 177.12(c)(1)(ii). Thus, in order to discern whether treatment has occurred, Customs must determine: (1) whether there was an examination of the entries; or (2) the extent to which the entries were otherwise reviewed to determine the proper application of the Customs laws and regulations. Id. Whether the review or examination constitutes treatment, however, is a matter of degree. See Motorola II, 436 F.3d at 1365. The analysis of whether treatment has occurred, therefore, is both qualitative and quantitative.

In determining whether treatment has occurred, the regulation also specifies which transactions Customs will accord diminished, or no weight, and will thereby disqualify from constituting a treatment. Section 177.12(c)(1)(ii) instructs that "[f]or purposes of establishing whether the requisite treatment occurred, Customs will give diminished weight to transactions involving small quantities or values . . . ." § 177.12(c)(1)(ii). It further directs that Customs "give no weight whatsoever to . . .

entries and transactions which Customs, in the interest of commercial facilitation and accommodation, processes expeditiously and without examination or Customs officer review[.]" Id. In other words, for an entry or transaction to be totally disregarded it is not sufficient that the entries be processed to expedite commercial interests; there must also be an absence of examination or review.

Lastly, the regulation instructs that to qualify as treatment, the purpose of the review must be in order to "determine the proper application of the Customs laws and regulations." See id.

### b. Application of "Treatment" in Light of § 177.12(c)(1)(ii)

As discussed supra, the CAFC found that "the admission of entries expeditiously and without examination or Customs officer review does not constitute treatment within the meaning of section 1625(c)(2)." Motorola II, 436 F.3d at 1367 (internal quotations omitted). It is undisputed that entries subject to Customs' bypass procedure are processed expeditiously, in the interest of commercial facilitation and accommodation. See G & R Produce Co., v. United States, 27 CIT __, __, 281 F. Supp. 2d 1323, 1333–34 (2003)(" Customs uses its bypass procedure to manage its workload. . . . Customs elected to place entries . . . on bypass for its own convenience . . . ."). As a result, in order to prove the

existence of a treatment and thereby prevail, Motorola need only demonstrate that a Customs Official examined or reviewed the particular entries to a sufficient enough degree. See Notice of Proposed Rulemaking, 66 Fed. Reg. 37,370, 37,375 (Dep't Treasury July 17, 2001) ("the burden of proving the existence of a treatment is on the person claiming the treatment."). Specifically, it is incumbent upon Motorola to demonstrate both that the particular entries fall within the general rule of the regulation, and that the limiting language of the regulation does not apply to the entries at issue. See § 177.12(c)(1)(ii)(giving "diminished" or "no" weight to certain entries or transactions.).

The disposition of this issue, then, turns on whether there has been sufficient examination or review by Customs. Neither the statute nor the regulation, however, define these terms. A basic principle of statutory construction is that a Court will give an undefined term its "ordinary, contemporary, common meaning." Perrin v. United States, 444 U.S. 37, 42, (1979). A dictionary is an appropriate resource for gleaning that ordinary meaning. See Koyo Seiko Co., Ltd. v. United States, 36 F.3d 1565, 1571 n.9 (Fed. Cir. 1994); see also Best Power Tech Sales Corp. v. Austin, 984 F.2d 1172, 1177 (Fed. Cir. 1993)("It is a basic principle of statutory interpretation, however, that undefined terms in a statute are deemed to have their ordinary understood meaning. For that meaning, we look to the dictionary.")(citation omitted).

Rules of statutory construction are similarly applicable to the Code of Federal Regulations, interpreting a statute. See Harak v. United States, 30 CIT __, __, Slip Op. 06-106 at 28 (July 18, 2006)(not published in the Federal Supplement)(applying the "cannons of statutory construction [to] the regulation at issue.").

Black's Law Dictionary defines review as "consideration, inspection, or reexamination of a subject or thing." Black's Law Dictionary 1345 (8th ed. 2004). Similarly, Webster's defines review as "to study or examine again; to consider retrospectively." Webster's II New Riverside University Dictionary 1006 (Riverside Publishing Company 1994). "Examination" is defined as an "investigation; search; inspection[.]" See Black's Law Dictionary 557 (6th ed. 1990). Webster's Dictionary defines "examine" as "to inspect in detail[;] to analyze or observe carefully; to question formally." Webster's, 449. In determining whether the bypass entries were reviewed or examined, and thereby received treatment, the Court applies these common, ordinary dictionary definitions.

In an effort to demonstrate that its bypass entries were processed with review or examination, Plaintiff relies upon various Customs sources. In order to fully understand both Plaintiff and Defendant's arguments, however, the Court first sets

forth a summary of the relevant bypass procedure, as laid out in Customs' Directive 3550-26 ("Directive"). See generally Directive 3550-26 (Dep't of Commerce Sept. 8, 1987). As an initial matter, the Directive pertains to "primary" or "pure" bypass. See Directive ¶ 3. Moreover, at that time, a manual bypass system was in operation.[7] Id. ¶ 2.

Entry summaries are subject to a process known as "entry segregation." See Directive ¶¶ 3, 4.A & B. Entry segregation occurs at the entry level but "prior to the import specialist review." Id. ¶ 4.B. During entry segregation, entries are sorted by entry unit personnel in accordance with a criteria list based on data contained in Customs Form ("CF") 7501. Id. The criteria list "delineates the entries that will not be bypassed." Id. ¶ 4.A (emphasis added). Indeed, the criteria list is a default to bypass.[8] In other words, any type of entry summary not falling

---

[7] The June 12, 1981 Headquarters Manual Supplement number 3500-02 established national guidelines for implementation of a manual entry selection system or bypass. See Directive ¶ 2. The 1987 Directive established "a uniform national procedure for processing entries under the current manual entry selection procedures." Id. ¶ 2. This manual system, however, was an interim procedure. As summary selectivity was implemented, an automated bypass supplanted the manual procedure. At the time the Directive was written, however, manual bypass was "the only viable bypass system," and the Directive pertained solely to the manual bypass procedure. See Id. ¶¶ 1, 2.

[8] The following entry categories are not forwarded to bypass:
      Absolute Quota and/or Visa

(continued...)

within the criteria on the list receives bypass processing; any entry category meeting the criteria is not forwarded to bypass. The soundness and integrity of this criteria is ensured by regional and district managers through a review of a random sample of the entries processed through bypass. See Id. ¶ 4.C. This check is performed after bypass processing. Id. Once the entries have been sorted for bypass processing, the Entry Aids verify the presence of the following on the CF 7501: Importer; TSUSA (the predecessor to HTSUS); Country of Origin; Value; and Signature or Approved Facsimile on CF 7501. Id. ¶ 4.B. Absence of any of these data elements result in the entry being routed through the Entry Officer for any appropriate action under the broker compliance program. Id. No other data is verified. Id. Once an entry is deemed eligible for bypass, it undergoes immediate liquidation processing. Id.

With this framework in mind, the Court addresses Plaintiff's contentions. First, Motorola urges that "this Court . . . reach the same result as in its original decision [finding that the bypass entries were treated] because Customs reviewed Motorola's

_____

(...continued)
         Steel Requiring SSSI
         Antidumping Duty Actions
         Countervailing Duty Actions
         Significant Trade Issues
         Headquarters Directed Actions.

See Directive ¶ 4.A.

bypass entries." Pl.'s Mem. at 5.  In support of its position, Motorola first relies upon deposition testimony taken from a Customs Rule 30(b)(6) agent ("Agent Dep."). Id. at 5 (citing to Deposition of John Elkins at 26).  Motorola quotes the following testimony, which it purports buttresses its conclusion that "Customs actually reviews entries put on bypass":

> Q: So Customs doesn't look at the shipment or the paperwork on bypass entries. Is that –
>
> A: Quite often they don't, yes, other than for a periodic maybe verification, an audit spot check type of thing that happens, a quality-assurance type function. That would be the only way they would look at it, unless there was some specific allegation that somebody was doing something wrong with their merchandise that was on bypass.

Id. (citing Agent Dep. at 26).

The Court interprets the Agent's testimony differently than Motorola, and finds that it detracts from, rather than supports Motorola's claim.  The question posed to the Agent was whether Customs "looks at" the bypass shipment or paperwork.  The Agent responded that "quite often" Customs does not, "other than for a periodic . . . audit spot check type of thing." Id.  This response indicates to the Court that most often, Customs does not "look," let alone review, the bypass entries' shipment or paperwork.  Thus, the Agent's testimony cannot be properly viewed as supporting the conclusion that Customs "reviews" the bypass entries.  Assuming arguendo that the agent does "look" at the entries, a look does not rise to the level of review, i.e., a

"consideration," or "inspection." The "audit spot check type of thing" referenced by the Agent appears to be the exception, rather than the norm. Indeed, the Agent characterized the audit as "periodic." Id. Moreover, if and when this periodic check does occur, its purpose is not for determining the proper application of the Customs laws and regulations, as is required by the regulation, but instead for a "quality assurance type function." Id. Motorola characterizes this function as "spot checks" and claims that they are "central to the bypass program." Id. Motorola cites no authority in support this proposition. The Court, however, finds testimony relevant to these "checks." See Pl.'s Mem., Ex. A at 26 (Agent Dep.). The Agent Deposition reflects that "there is no checking. The documentation is all accepted electronically. There is no paperwork. It is a mutual trusting relationship that exists." Id. Although, Motorola claims that the "checks" are integral to the bypass program, the Court finds that the Agent's testimony suggests otherwise.

Next, Motorola relies upon Customs Directive 3550-26. Pl.'s Mem. at 6 (citing Directive ¶3, 4). According to Plaintiff, the Directive instructs that Customs sort all entries for possible placement on bypass status based on certain criteria, "including tariff classification." Id. ("[C]lassification is one of the criteria used to determine whether to place an entry on bypass status."). Despite Plaintiff's assertion, the Directive indicates

that the criteria "delineates those entries which <u>cannot</u> be processed through bypass."  Directive ¶3 (emphasis added). Although the Directive states that the criteria will be "based upon data found on the CF 7501," it does not list tariff classification as one of the criterion.[9]

Motorola also relies upon the Directive for the proposition that Customs' managers review a "random sample, generally 2 to 10 percent" of entries placed on bypass to "ensure . . . the integrity and soundness of criteria used to identify bypass entr[ies]."  Pl.'s Mem. at 6 (quoting Directive ¶ 4.C).  This, Motorola contends, rebuts Customs' claim that it never reviewed Motorola's entries because they were on bypass, when "between 2 to 10 percent of [its] entries were, in fact, reviewed by Customs for classification accuracy."  <u>Id.</u> at 7.  The Court finds Motorola's argument unconvincing.

The cited paragraph of the Directive, entitled "Bypass Review," reflects the following:

> Regional and district managers will ensure

---

[9]     The Court notes that a reference to "TSUSA," the predecessor to HTSUS, appears in paragraph 4 of the Directive. <u>See</u> Directive ¶ 4.  This reference, however, is simply part of a list of information that must appear on CF 7501, including <u>inter alia</u>, "importer"; "Country of Origin"; and "Signature of approved facsimile on CF 7501."  <u>Id.</u>  That TSUSA is present on this list, however, does not support Plaintiff's statement that "classification is one of the criteria used to determine whether to place an entry on bypass status."  <u>See</u> Pl.'s Mem. at 6.

that the integrity and soundness of criteria used to identify bypass entry summaries are maintained.  They will accomplish this through a review of a random sample, generally 2 to 10 percent, of the entry summaries processed through bypass. . . . The import specialist team responsible for the merchandise on the bypassed entries shall thoroughly review the random sample. . . .  Random sampling, and import specialist, or supervisory import specialist review, shall be the only method of bypass review used.

Directive ¶ 4.C.  First, the Directive makes clear that this limited "review" is intended only to ensure the maintenance of the criteria used to identify bypass entries.  It is not, however, intended to verify tariff classification.  Second, the review is limited to a random sampling of only two to ten percent of all entries placed on bypass.  Id.  It is highly unlikely that given the universe of all of the bypass entries, that two to ten percent of Motorola's entries were reviewed.[10]  Moreover, it is a near

---

[10]    Defendant makes the following, similar argument:

> While the 1987 Directive instructed regional and district managers to review a random sampling of 2-10% of bypassed entries, the universe of entries to be randomly sampled would have included all importers in a given region or district. For any random sampling to have resulted in 2-10% of Motorola's entries being reviewed would have meant that Motorola was the sole importer in the Customs region or district (or at least the only importer whose entries were selected for "random" review).  This is highly unlikely considering that the majority of the bypass entries upon which

(continued...)

statistical impossibility for all of Motorola's bypass entries to have fallen within the random two to ten percent sampling. In any event, the Court is not convinced that simply because Customs randomly reviews a small percentage of entries, that such random review is of a degree sufficient enough to constitute treatment. See Motorola II, 436 F.3d at 1365. Here, a random review of two to ten percent of all bypass entries is insufficient to constitute treatment.

Lastly, Motorola points to Customs Head Quarter Ruling 225191 (Apr. 19, 1994)("HQ 225191"). See Pl.'S Mem. at 7. This, Motorola claims, further supports its position that Customs reviews bypass entries for classification, and by accepting or rejecting a particular classification, reaches a legal determination. Id. at 7-8 (citing HQ 225191)("Customs itself has made clear that Customs officers make determinations with respect to bypass entries and that Customs, when it accepts a classification . . . has made a legal determination[.]").[11] The

_____

(...continued)
Motorola is relying were made through major ports, i.e., Atlanta, Georgia; Anchorage, Alaska; and Chicago, Illinois.

Def.'s Mem. at 12.

[11] The relevant text of the cited HQ Ruling, is as follows:

Entry summaries are evaluated

(continued...)

language highlighted by Motorola, however, is not properly interpreted as indicating that, in accordance with the Directive, the liquidation of a bypass entry is equivalent to a Customs officer actually reviewing the entry and independently determining the correct tariff classification. Rather, when manual bypass was in operation under the Directive, entry segregation was a clerical task performed by Entry Unit personnel, not by an import specialist with the authority to classify goods. See Directive ¶ 4; Def.'s Mem. at 10–11. An import specialist would only see the entries if they met the criteria disqualifying them from bypass status. See Directive ¶ 4. Under manual bypass procedure, the only classification-type function that might have been performed by an Entry Aid would be to verify the presence of a TSUS tariff provision on the CF 7501. Id. Ensuring the appearance of a tariff provision on a Customs form does not constitute a review sufficient for classification purposes. As commonly defined, a

---

(...continued)
against a pre-set criteria. One of the elements in this criteria is classification. See C.D. 3550-26, Entry Simplification - Bypass Procedures, issued September 8, 1987. Once the appropriate Customs officers has determined that an entry summary is eligible for bypass processing and has accepted the classification asserted by the filer as correct, a legal determination has been made . . . ."
Pl.'s Mem. at 8 (citing HQ 225191).

review involves "consideration" or "inspection." Black's 1345. Consideration is defined as "continuous and careful thought." Inspection is defined as "view[ing] closely in critical appraisal." See Meriam-Webster Online Dictionary 2004, http://www.meriam-webster.com (last visited Nov. 7, 2006). Indeed, both of these terms connote a critical appraisal, rather than a quick glance meant to confirm the appearance of a code in an allotted space. Were the entry specialist charged with ensuring the correct tariff classification, a different result would obtain. This, however, is not what the Directive instructs. Accordingly, the Court finds that HQ 225191 fails to support Motorola's position.

The history of the regulation lends further support to the Court's conclusion that no treatment was accorded to the bypass entries. The legislative history of § 177.12(c)(2)(ii) indicates that bypass entries should generally be disregarded in determining the existence of treatment. See 66 Fed. Reg. at 37,375. Indeed, the Notice of Proposed Rulemaking for § 177.12(c)(2)(ii) explains that the proposed text was intended to reflect Customs' operational reality, that "under selectivity and bypass and related procedures Customs simply does not intervene in the vast majority of the approximately 18 million formal entries filed annually . . . . Customs believes that it would be inappropriate to conclude, as a legal matter, that Customs accorded treatment to

a transaction in those circumstances." Id. The Notice of the Final Rule similarly indicates that as a result of bypass procedure "the vast majority of import transactions do not receive Customs review. Since those unreviewed transactions receive no action on the part of Customs, they should not be considered to constitute a 'treatment' within the meaning of 19 U.S.C. 1625(c)." Final Rule, 67 Fed. Reg. 53,483, 53,491 (Dep't Treasury Aug. 16, 2002). The references to bypass in the Federal Register indicate that Customs intended for bypass entries to be included among the transactions that are given "no weight whatsoever" under § 177.12(c)(2)(ii). See Id.; 66 Fed. Reg. at 37,370.

In the event that the Court "disagree[s] with [its] assertion . . . that Customs reviewed [its] entries[,] Motorola requests the opportunity to reopen discovery. . . ." See Pl.'s Mem. at 7 n.6. Defendant responds that this request is a concession by Motorola that it does not address whether the particular entries at issue were processed without review or examination.[12] See Def.'s Mem. at

---

[12] In addition, Defendant argues that the Court should find that Motorola had ample opportunity to conduct its discovery. Moreover, due to Motorola's paperless electronic filing, additional discovery would be futile. Def.'s Mem. at 14. Electronic filing only reflects limited information and would not provide enough information for Customs to perform a substantive review for classification purposes. Defendant notes that in order for Customs to have performed the type of examination necessary to determine if Motorola's entries fell outside of the ambit of § 177.12(c)(1)(ii), Plaintiff would have had to provide Customs with invoices supporting each entry. Id.

13. Because Plaintiff did not make a motion to reopen discovery, however, the Court will not address this point. See USCIT R. 7(f) ("An application to the court for an order shall be by motion . . . shall be in writing and shall state, with particularity, the grounds therefor.").

Finally, inherent in Plaintiff's failure to demonstrate that, as a general matter, bypass entries are subject to treatment is its failure to show that the particular bypass entries at issue were treated. In Motorola II, the CAFC directed that this Court address "whether the particular bypass entries at issue in this case were processed without review or examination by Customs . . . ." See Motorola II, 436 F.3d at 1367. Logic dictates that if, on remand, Plaintiff fails to prove a broader proposition, then it certainly has not proven the narrower point, i.e., that the particular entries were subject to treatment. The Court, therefore, finds that Motorola's proffered support does not show that Customs treated the particular bypass entries at issue.

For the foregoing reasons, the Court finds that Motorola has not demonstrated that the 900 bypass entries at issue were subject to examination or review sufficient to constitute "treatment" for purposes of 19 U.S.C. § 1625(c)(2), as interpreted by 19 C.F.R. § 177.12(c)(ii)(1). It is incumbent upon the party claiming treatment to demonstrate that such has occurred. See 66 Fed. Reg.

at 37,374. Plaintiff has failed to do so.

### III. The Issuance of the Preliminary Ruling Letters Does Not Constitute Treatment Within the Meaning of 19 U.S.C. § 1625(c)(2) and 19 C.F.R. § 177.12(c)(1)(ii)

In Motorola I, this Court found that the PRLs at issue met "the definition of interpretative rulings, and that HQ 961050 d[id] not modify or revoke a prior interpretative ruling. Accordingly, Customs' failure to publish HQ 961050 in the Customs Bulletin did not violate 19 U.S.C. § 1625(c)(1)." Motorola I, 30 CIT at __, 350 F. Supp. 2d at 1068. This finding was not appealed and, thus, is not a subject of this remand determination. Instead, Plaintiff now contends that Customs violated 19 U.S.C. § 1625(c)(2), because the issuance of the two PRLs established a "treatment." See Pl.'s Mem. at 8.

### A. Contentions of the Parties

Plaintiff characterizes the issue as whether entries made pursuant to the PRLs constitute treatment, under 19 C.F.R. § 177.12(c)(1)(ii).[13] See Pl.'s Mem. at 8. Because the PRLs did not support a claim under § 1625(c)(1), Plaintiff claims that the issuance of the PRLs involved "substantial review" and "classification" of "substantially identical merchandise" by

---

[13] In Motorola I, although acknowledging that Plaintiff raised the issue, this Court did not rule on whether the PRLs issued by Customs in 1992 and 1994 constituted treatment. In light of the CAFC's decision in Motorola II, however, this Court will now decide this issue on remand.

Customs, and thus constitutes treatment. <u>See</u> <u>id.</u> at 8–9. <u>See</u> <u>generally</u> § 1625(c)(2) (providing for notice and comment procedure where there has been a modification of a "treatment.").

Defendant responds that "Motorola's goal appears to be to have the Court accept that, even when an interpretative ruling (here, Motorola's PRLs) cannot support a claim under 1625(c)(1), the ruling can nevertheless form the basis for a treatment under 1625(c)(2)." Def.'s Mem. at 15. Defendant finds Plaintiff's argument both unsupported and unconvincing and instead maintains that a "more logical reading of [the statute] is that Congress intended subsections (c)(1) and (c)(2) to have the same impact, but under different situations, the former when a prior interpretative ruling . . . has been issued, and the latter when no previous interpretative ruling or decision has been issued." <u>Id.</u> Reading subsection (c)(2) as including interpretative rulings, Defendant argues, would render subsection (c)(1) redundant.[14] <u>Id.</u> The Court agrees.

## B. Analysis

As an initial matter, the Court must determine whether a "prior interpretative ruling" may also constitute a "treatment" under § 1625(c). The Court begins its analysis by looking at the

---

[14] Both Plaintiff and Defendant put forth additional substantive arguments, however, the Court need not address these arguments. <u>See</u> <u>e.g.</u>, Pl.'s Mem. at 10–15; Def.'s Mem. at 17–22.

language of the statute itself.  See <u>United States Dep't Treasury</u> <u>v. Fabe</u>, 508 U.S. 491, 500 (1993); <u>Group Life & Health Ins. Co. v.</u> <u>Royal Drug Co.</u>, 440 U.S. 205, 210 (1979).  As set forth <u>infra</u>, 19 U.S.C. § 1625(c) provides that:

> A proposed interpretive ruling or decision which would –
>
> > (1)  modify . . . or revoke a prior interpretative ruling or decision which has been in effect for at least 60 days; or
> >
> > (2)  have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions;
>
> shall be published in the Customs Bulletin . . . .

in order to ensure compliance with the notice and comment procedures set forth therein.  See 19 U.S.C. § 1625(c).

Plaintiff's interpretation of the statute requires the Court to find that a prior interpretative ruling which does not fall within the parameters of subsection (c)(1), can nonetheless be properly classified as a treatment under subsection (c)(2).  Under such a reading, however, every prior interpretative ruling could qualify as a treatment, and thereby render subsection (c)(1) nugatory.  General principles of statutory construction preclude this result.

As previously explained, subsection (c)(1) pertains only to "prior interpretative rulings and decisions."  See § 1625(c)(1).

It is undisputed that a PRL is a prior interpretative ruling. See Motorola II, 426 F.3d at 1368. Subsection (c)(2) pertains solely to "treatment" by Customs. See id. Treatment involves a pattern of action by Customs involving, inter alia, a sufficient degree of examination or review for classification purposes. See Motorola II, 436 F.3d at 1365; Precision, 24 CIT at 1043, 116 F. Supp. 2d at 1377. It seems that the issuance of a PRL necessarily involves treatment because Customs is reviewing the entries for classification purposes. See Customs Directive, 3610-02, ¶ 2 (Dep't Commerce Mar. 8, 1989), Pl.'s Ex. D ("During a preclassification review, a Customs Field National Import Specialist will review and propose a product classification . . . The National Import Specialist (NIS) Division will review all classification determinations proposed during a preclassification review."). This notwithstanding, because a PRL is a prior interpretative ruling, it is governed by (c)(1) and therefore not within (c)(2).

Construing § 1625(c) in the manner urged by Plaintiff would create a fictitious catchall in subsection (c)(2), which would render subsection (c)(1) meaningless. That is, every PRL issued would fall within the parameters of subsection (c)(2) and would eliminate any need for subsection (c)(1). This would violate the tenet that, where possible, the Court will avoid reading a statute in a manner that would render some words redundant. See Gustafson

v. Alloyd Co., Inc., 513 U.S. 561, 575 (1995). The Court will not interpret a statute to render other provisions of the same statute superfluous. See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000)(citation omitted). Rather, a court must "interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole." Id. Indeed, a "cardinal principle of statutory construction is to save and not to destroy." See United States v. Menasche, 348 U.S. 528, 538 (1955)(citation omitted).

The construction issue may also be resolved by the doctrine of noscitur a sociis, i.e., "a word is known by the company it keeps." Gustafson, 513 U.S. at 574. Here, the word "treatment" is in the company of its alternative subsection (c)(1), covering "interpretative rulings." See § 1625(c)(1),(2). Specifically, the doctrine provides that a court should "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress.'" Id. (quoting Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307 (1961)). Here, ascribing meaning to the word "treatment" that encompasses the otherwise provided for "prior interpretative rulings," gives unintended breadth to subsection (c)(2). Under Plaintiff's proposed interpretation, the phrase "prior interpretative ruling" would be subsumed entirely within the term "treatment" and the disjunctive "or" would be rendered

meaningless.  Basic principles of statutory construction preclude such an interpretation.  See Beck v. Prupis, 529 U.S. 494, 506 (2000).

For the foregoing reasons, the Court finds that the issuance of the two PRLs, previously determined to be prior interpretative rulings, cannot for purposes of § 1625(c), also constitute a "treatment."

**IV.  Because the Entries at Issue Were Not Subject to Treatment, Customs Did Not Violate 19 U.S.C. § 1625(c)**

Section 1625(c) requires publication, with notice and comment, where a prior interpretative ruling or decision modifies the treatment previously accorded by Customs to substantially identical transactions.  See § 1625(c)(2).  Here, Customs did not violate the statute because: (1) the 900 bypass entries at issue were not subject to treatment; and (2) the two PRLs at issue were found to be prior interpretative rulings covered by subsection (c)(1), and thereby not within the parameters of subsection (c)(2).  Accordingly, Customs was not required to comply with the notice and comment provisions of § 1625(c).

**Conclusion**

The Court finds that the liquidation of the 900 bypass entries at issue does not constitute treatment within the meaning of 19 U.S.C. § 1625(c)(2), as interpreted by 19 C.F.R.

§ 177.12(c)(1)(ii). The Court further finds that the issuance of the two preliminary ruling letters does not constitute treatment within the meaning of 19 U.S.C. § 1625(c)(2) and 19 C.F.R. § 177.12(c)(1)(ii). Accordingly, the Court finds that Customs did not violate § 1625(c)(2) by failing to publish HQ 961050 in the Customs Bulletin. For the foregoing reasons, the Court enters judgment for Defendant, United States, and dismisses this action. Judgment shall be entered accordingly.

    /s/ Nicholas Tsoucalas    
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated:    November 13, 2006
           New York, NY